SUSANNA TORREY *v.* ROSWELL M. FIELD.

WINDSOR,
February,
1838.

In a suit for libel, if the defendant justify, by showing the truth of the publication, he must plead that specially, particularly specifying those acts of which the plaintiff was guilty, that the court may see whether the defendant was justified in what he published. It is not sufficient, in such case, to plead generally, that the words or matters contained in the alleged libel are true.

In such case, if defendant justify, by pleading the truth, he must plead the very charge, and it is not sufficient to plead one of a similar character, although of the same, or even greater enormity.

It is competent for the defendant, in this action, to plead to part of the declaration, or parcel of the supposed libel, but if the pleader attempt to designate the portion, by setting it forth *in hæc verba,* the omission or substitution of a single word will be a fatal variance.

A special plea of justification must be a good defence to the whole declaration, or, at least, to that portion of it which is attempted to be answered, or it is bad.

A mere agreement between two, or more, to do an unlawful act, without any act done in furtherance of the common design, is not, ordinarily, an indictable offence.

If the defendant, in an action for libel, justify the publication, as being made in the due course of judicial proceedings, he may give it in evidence under the general issue, as he may any other matter, which goes to rebut all legal presumption of malice.

Or he may plead such defence specially, as he may any other defence, which admits the making of the publication.

In such plea, it is not necessary to allege that the words published were true, or that the defendant believed them to be true, or that they were necessary, or that he was advised or believed them to be necessary to the obtaining his redress in a court of justice, &c., but only that the publication was made in the due course of judicial administration, and that the form of proceeding was according to the due course of practice in such tribunal.

It is no answer to such plea, in this action, that the proceeding was instituted without probable cause, and from motives of malice. But if the party went beyond what was warranted by the forms of proceeding, in such tribunal, he is liable, in this action, for the excess, which may be specially replied, by way of new assignment, and the question, whether done through malice, or from justifiable cause, will then be referred to the jury.

Whether a publication be according to the course of practice in the court of chancery, is a matter of fact, to be tried by the jury.

A plea is not double, unless it contain more than one ground of defence to the action, although it may contain many distinct matters, all going to make one entire defence.

THE declaration in this case was for a libel, and contained five counts, the first of which, after alleging, in usual form, the good character of the plaintiff, was as follows;

'And whereas, also, before the committing of the several 'grievances by the said Roswell M. Field, in the several

'counts herein after mentioned, to wit, on the 9th day of
'December, in the year of our Lord seventeen hundred and
'ninety eight, the said Susanna was lawfully joined in mar-
'riage with one Elisha Phelps, and from that time she lived
'and cohabited with the said Elisha Phelps, as his lawful
'wife, for a long space of time, to wit, until the 4th day of
'April, in the year eighteen hundred and nineteen, when the
'said Elisha departed this life, leaving the plaintiff his wid-
'ow, and the following heirs and issue of said marriage, to
'wit, Francis E. Phelps, Edward E. Phelps, Laura Amelia
'Phelps, Susan Maria Phelps, and Mary Almira Phelps,
'and leaving also a son by a former marriage, to wit, Charles
'Bartlett Phelps, and disposing of his estate by will, to his
'said heirs and the plaintiff; yet the said Roswell M. well
'knowing the premises, but greatly envying the happy state
'and condition of the plaintiff, and contriving and intending,
'&c., heretofore, to wit, on the 17th day of May, in the year
'of our Lord eighteen hundred and thirty four, at Windsor
'aforesaid, falsely, wickedly, and maliciously did compose
'and publish, and cause and procure to be published, of and
'concerning the said Susanna, and of and concerning said
'marriage of the plaintiff with the said Elisha Phelps, and
'of and concerning the said property of the said Elisha Phelps,
'left and disposed of as aforesaid, a certain false, scandalous,
'malicious, and defamatory *libel*, containing, among other
'things, in divers parts thereof, the false, scandalous, mali-
'cious, and defamatory and libellous matter following, of and
'concerning the plaintiff, and of and concerning the said
'marriage, and of and concerning the said property of the
'said Elisha, left as aforesaid, that is to say ;—

" *In Chancery.*

" Roswell M. Field and Mary Almira, his wife, late Mary
   " Almira Phelps, orator and oratrix, *against* Mistress Su-
   " sanna Torrey, widow of the late Doct. Erastus Torrey,
   " and who, before her intermarriage with said Torrey, was
   " Susanna Eastman, spinster," ('meaning the plaintiff,')
   " Francis Eastman Phelps, Edward Elisha Phelps, Rufus
   " Emerson, and Mistress Laura Amelia, his wife, late Lau-

" ra Amelia Phelps, and Charles Bartlett Phelps, defen-
" dants.

" The bill in this case states, that Doct. Elisha Phelps, late
" of Windsor, in the county of Windsor," ('meaning the
' plaintiff's said husband,') " on the 8th day of March, 1787,
" at Chatham, in the present county of Middlesex, and State
" of Connecticut, by the Rev. Cyprian Strong, the settled
" minister of said Chatham, was duly joined in marriage with
" Miss Molly Bartlett, a young, amiable, and interesting mai-
" den of Chatham ; that in a few years after such intermar-
" riage, the said Molly was attacked by a violent and invete-
" rate disease, by which her eye-sight was greatly impaired,
" and thereupon, the said Elisha went about to employ other
" female help, meet for the upholding of his domestic estab-
" lishment, and, to that end, engaged one Hopy Talbot of
" Pocatapaug Flats, spinster, to take up her residence at the
" mansion house of the said Elisha, to minister unto his wants
" and necessities, as a house-keeper and hand-maiden, and
" to stand to and perform the things needful in that behalf ;
" that it was agreed between the said Elisha and the said Ho-
" py, that, in lieu of all pecuniary compensation, the said
" Hopy, while in the said Elisha's employ, was to be provided
" with good and wholesome meat, drink, sufficient clothing,
" and comfortable lodging ; that the said Hopy entered upon
" the discharge of her duties, and performed the same
" in such open and undisguised manner, that the said Molly
" was apprised of the nature of the whole contract between
" the said Elisha and Hopy," ('meaning that the said Elisha
' Phelps lived and cohabited with the said Hopy Talbot, in an
' illicit manner, and in a state of adultery,') " and thereupon,
" the said Molly was seized with chronic spasms, attended
" with the lachrymose ophthalmy, and a sympathetic hysteria
" supervened, whereby she became totally blind, and the said
" Elisha was induced to dismiss the said Hopy from his ser-
" vice, and, in a short time thereafter, he employed Susanna
" Eastman, spinster, then commonly called Sukey Eastman, a
" milliner or tailoress of Hanover, in the State of New Hamp-
" shire, or thereabouts, now Mistress Susanna Torrey of
" Windsor, in the county of Windsor," ('meaning the plain-
' tiff,') " to supply the vacancy in the said Elisha's household,

"occasioned by the discharge of the said Hopy, and to per-
"form the same services as the said Hopy, upon the same
"terms, and to be unto the said Elisha, in all things, as the
"said Hopy had been, and that said Susanna," ('meaning the
'plaintiff,') "in such way and manner, under such contract,
"engagement, agreement, and understanding, remained in
"the household of the said Elisha, supplying the place of
"Hopy Talbot of Pocatapaug Flats, until the decease of said
"Elisha, in 1819," ('thereby meaning that the plaintiff was
'not the lawful wife of the said Elisha, and during all that time
'had lived together and cohabited with the said Elisha Phelps
'in an illicit intercourse, and in a state of adultery.')

The second count differed from the first only in describing
the bill, as stating that Doct. Phelps was married to Molly
Bartlett, "grand-daughter of Rev. Moses Bartlett of Chatham,
"and great-grand-daughter of Rev. Phinehas Fisk of Had-
"dam," and in the concluding innuendo, which was as follows;
('meaning thereby that the plaintiff was not the lawful
'wife of the said Elisha, and that, during all that time, she
'lived and cohabited with the said Elisha, in the character
'of a kept mistress and concubine, and in the indulgence
'of an illicit and carnal intercourse.')

3d *Count.*

'And the said Susanna further saith, that the said Ros-
'well M. Field, further contriving and intending as aforesaid,
'heretofore, to wit, on the 24th day of May, in the year of
'our Lord 1834, at Windsor aforesaid, falsely, wickedly and
'maliciously, did compose and publish, and cause, and pro-
'cure to be composed and published of and concerning the
'said Susanna, a certain other false, scandalous, malicious
'and defamatory libel, containing, among other things, the
'false scandalous, malicious, defamatory and libellous mat-
'ter following, of and concerning the plaintiff, and of and
'concerning the said marriage of the plaintiff, with the said
'Elisha Phelps, and of and concerning the said will, and the
'said property of the said Elisha Phelps, left and disposed
'of as aforesaid, by said will;—that is to say,'—

"The bill further states, that the said Elisha," ('meaning
'the said Elisha Phelps, the plaintiff's said husband,') "made
"his will, dated the 16th day of March, 1819, and thereby,
"after giving a pecuniary legacy unto his wife Molly, inten-

" ded as a full provision for her, in lieu of dower and all " claim to his whole estate as widow ; and after giving other " pecuniary legacies, he" (' meaning the said Elisha Phelps') " gave, devised and bequeathed all the remainder and resi- " due of his estate, both real and personal, unto Charles " Bartlett Phelps, Francis Eastman Phelps, Edward Elisha " Phelps, Laura Amelia Phelps, now Mistress Laura Amelia " Emerson, Susan Maria Phelps and the oratrix," (' meaning ' the said Mary Almira Phelps,') " and to their heirs forever, " to be equally divided among them ; and he" (' meaning the ' said Elisha Phelps') "appointed Susanna Eastman, now Mis- " tress Susanna Torrey, then some times called Susanna " Phelps, by the name of Susanna Phelps" (' meaning the ' plaintiff') " and Robert Lord, executrix and executor of " said will. And that said Elisha departed this life, on or " about the 19th day of April, 1819, leaving said Charles " Bartlett Phelps his heir at law, and the oratrix, then being " about five years of age."

" The bill further states, that said will was duly proved " and that after the payment of the just debts of the testa- " tor," (' meaning the said Elisha Phelps') " and the particu- " lar legacies, there remain in the hands of the executor " and executrix," ('meaning the plaintiff,') "a large property, " amounting to about sixty thousand dollars, to be divided " among the residuary legatees and devisees.

" The bill further states, that said Susanna," (' meaning ' the plaintiff,') " contriving by sheer craft to cut off a large " part of the oratrix" (' meaning the said Mary Almira's') " just distributive share," (' meaning the share of the said ' Mary Almira') " of the residue," (' meaning the residue of ' the said estate of the said Elisha Phelps,') " and to leave " her" (' meaning the said Mary Almira,') " only a remnant " thereof, and having assumed the family name of the testa- " tor, began to give out in speeches, that she" (' meaning the ' plaintiff') " had been lawfully married to the testator," (' meaning the said Elisha Phelps,') "and to claim that, as his " widow, she was entitled to dower in his estate, and also en- " titled to have assigned to her one full third of all his per- " sonal property. And so the said Susanna Eastman, spin- " ster, now Mistress Susanna Torrey," (' meaning the plain- ' tiff') " by divers artful, cunning and fraudulent pretences

" and representations, and by much subtle, crafty and de-
" ceitful simulations, procured divers large and valuable
" tracts of land, situated in said Windsor, being part of
" the testator's estate," ('meaning a part of the estate of the
' said Elisha Phelps,') " to wit, the Parmele meadow, lying
" along Connecticut river,—the mansion house of the
" testator, with the adjacent grounds, situate near the state
" prison, and a piece of land on Nose hill, to be set off to
" her" ('meaning the plaintiff') "by the name of Susanna
" Phelps, as widow of the testator, for dower, by Abner
" Forbes, Samuel Shuttleworth and Luther Mills, a com-
" mittee appointed by the judge of probate for the district of
" Windsor, on the mere'motion of the said Susanna," ('mea-
' ning the plaintiff') "pretending to be the widow of the
" testator ; and in like manner procured one full third part
" of all said testator's personal property to be assigned to
" her, as aforesaid, by the same committee aforesaid."

    " The bill further states, that said Susanna" ('meaning the
' plaintiff') " ever since said fraudulent endowment, has en-
" joyed all said real and personal property, assigned as afore-
" said, as her" ('meaning the plaintiff's') own."

    *4th Count.*

    ' And the said Susanna, further saith that the said
' Roswell M. Field, further contriving and intending as afore-
' said, heretofore, to wit, on 24th day of May, in the year of
' our Lord 1834, at Windsor aforesaid, falsely, wickedly and
' maliciously did compose and publish and cause and procure
' to be published, of and concerning the said Susanna and of
' and concerning the said marriage of the plaintiff, with the
' said Elisha Phelps, a certain other, false, scandalous, mali-
' cious and defamatory libel, containing, among other things,
' in divers parts thereof, the false scandalous, malicious, de-
' famatory and libellous matter following, of and concerning
' the plaintiff, and of and concerning the marriage of the
' plaintiff with the said Elisha Phelps, that is to say,'

    " The bill in this case states that Doctor Elisha Phelps,
" late of Windsor, in the county of Windsor, on the 8th day
" of March, 1787, at Chatham in the present county of Mid-
" dlesex and state of Connecticut, by the Rev. Cyprian
" Strong, the settled minister of said Chatham, was duly
" joined in marriage with Miss Molly Bartlett ;—that in a

"few years after such intermarriage, the said Elisha went
" about to employ other female help, meet for the upholding
" of his domestic establishment, and, to that end, engaged
" one Hopy Talbot of Pocatapaug Flats, spinster, to take
" up her residence at the mansion house of the said Elisha,
" to minister unto his wants and necessities, as a house-keep-
" er and hand-maiden, and to stand to and perform the
" things needful in that behalf; that it was agreed between
" the said Elisha and the said Hopy, that in lieu of pecunia-
" ry compensation, the said Hopy, while in the said Elisha's
" employ, was to be provided with good and wholesome meat,
" drink, sufficient clothing and comfortable lodging ; that
" the said Hopy entered upon the discharge of her duties
" and performed the same is such open and undisguised
" manner, that the said Molly was apprised of the nature of
" the whole contract between the said Elisha and Hopy, and
" thereupon the said Elisha was induced to dismiss the said
" Hopy from his service, and in a short time thereafter he"
(' meaning the said Elisha Phelps') "employed Susanna East-
" man, spinster, then commonly called Sukey Eastman, a
" milliner or tailoress of Hanover, in the state of New-
" Hampshire or thereabouts, now Mistress Susanna Torrey of
" Windsor, in the county of Windsor" (' meaning the plain-
' tiff ') " to supply the vacancy in the said Elisha's household,
" occasioned by the discharge of the said Hopy, and to
" perform the same services as the said Hopy, upon the same
" terms, and to be unto the said Elisha in all things, as the
" said Hopy had been, and that said Susanna" (' meaning the
' plaintiff ') " in such way and manner, under such contract,
" engagement, agreement and understanding, remained in
" the houschold of the said Elisha, supplying the place of
" Hopy Talbot of Pocatapaug Flats, until the decease of
" the said Elisha in 1819." (' Meaning thereby that the plain-
' tiff was a single and unmarried woman, and not the law-
' ful wife of the said Elisha Phelps, and that during all that
' time, she the plaintiff lived and cohabited with the said
' Elisha Phelps, in the character and condition of a kept mis-
' tress and concubine, and in the indulgence of an illicit and
' carnal intercourse, and under such wicked and unlawful
' agreement as is above set forth.')

" At other times the said Susanna," (' meaning the plain-

WINDSOR,
February,
1838.

Torrey
v.
Field.

' tiff ') " admitting that there was a good and valid marriage
" between the said Elisha and Molly, pretends that after-
" wards a divorce was granted unto said Molly, upon her
" petition, for and on acount of the acts of adultery of said
" Elisha, at different times, with different women, and that,
" after such divorce granted, said Elisha and said Susanna,"
(' meaning the plaintiff') " intermarried ; whereas the bill, by
" charge, denies that a divorce was ever petitioned for by, or
" granted to, said Molly ; and also charges that if any petition
" was made, or divorce granted, the same were procured by
" the deception, imposition, unfair means and practices of
" said Elisha and Susanna," (' meaning the plaintiff.')

" And as evidence thereof, the bill charges that, at the date
" of such pretended petition, and for a long time before, said
" Molly was and had been, of feeble health, severely afflic-
" ted with fits, wholly blind, and therefore unable to read
" and write, and incapable of doing any business whatsoever;
" that said Elisha procured the draft of said pretended peti-
" tion, at the instance of the said Susanna," (' meaning the
' plaintiff') " who was then living with him, as the successor
" of Hopy Talbot of Pocatapaug Flats,' (' meaning that she
' the plaintiff was then a single and unmarried woman and
' was at the date of said petition, and before, living with the
' said Elisha Phelps in the character and condition of a kept
' mistress and concubine, and in the indulgence of an illicit
' and carnal intercourse, and under such wicked and unlaw-
' ful agreement as is above set forth,') " and without the di-
" rection, consent or knowledge of said Molly ;" (' meaning
' and intending to have it understood and believed, that the
' plaintiff wrongfully induced the said Elisha Phelps to pro-
' cure the draft of a petition of his wife Molly, for a bill of
' divorce from him.')

" The bill also charges, that the said Elisha and Susanna,"
(' meaning the plaintiff") " never did intermarry after the date
" of such pretended divorce, and that their cohabitation was,
" in its inception and continuance, altogether meretricious
" and unlawful."

" At other times the said Susanna," (' meaning the plain-
' tiff') " conceding that she never was the lawful wife of
" said Elisha, pretends that she had been his servant, for
" many years, faithfully ministering unto his wants, and that

WINDSOR,
*February,*
1838.

Torrey
*v.*
Field.

" his estate was justly indebted to her" ('meaning the plain-tiff') "for her wages in that behalf, in a sum equal to the "property assigned to her as aforesaid."

" Whereas the bill charges that she" ('meaning the plain-tiff,') "was taken into his service" ('meaning the service of 'the said Elisha Phelps,') "as a substitute for, and on the "same terms as Hopy Talbot of Pocatapaug Flats, that "said Hopy was to be well fed, sufficiently clothed and "warmly and comfortly lodged, in lieu of all pecuniary com-"pensation, and that said Susanna" ('meaning the plaintiff') "was well provided with sufficient meat, raiment and com-"fortable lodging to as great degree as Hopy Talbot of Pa-"catapaug Flats, according to the original contract, agree-"ment and understanding in that behalf," ('thereby again 'meaning and insinuating and intending to have it under-'stood and believed, that the plaintiff lived and cohabited 'with the said Elisha Phelps, in the character and condition 'of a kept mistress and concubine, in pursuance of a wicked 'and unlawful agreement for that purpose.')

*5th Count.*

' And the said Susanna further saith, that the said Roswell 'M. Field, further contriving and intending as aforesaid, 'heretofore, to wit, on the 24th day of May, in the year of 'our Lord 1834, at Rockingham in the county of Windham, 'to wit, at Windsor, in the county of Windsor, aforesaid, 'falsely, wickedly and maliciously did compose and publish, 'and procure and cause to be published, a certain other 'false, scandalous, malicious and defamatory libel, of and 'concerning the said plaintiff, and of and concerning the 'marriage of the plaintiff, with the said Elisha Phelps, and 'of and concerning the said will, and the said property of 'the said Elisha, left as aforesaid, of the tenor and effect 'following, that is to say,'—

*"In Chancery,*

" Roswell M. Field and Mary Almira, his wife, (late Mary " Almira Phelps,) orator and oratrix, *against* Mistress Su-" sanna Torrey, widow of the late Doct. Erastus Torrey, " and who, before her intermarriage with said Torrey, " was Susanna Eastman, spinster," ('meaning the plaintiff,')

"Francis Eastman Phelps, Edward Elisha Phelps, Rufus
"Emerson and Mistress Laura Amelia, his wife, late Laura
"Amelia Phelps, and Charles Bartlett Phelps, defendants.

"The bill in the case states, that Doct. Elisha Phelps, late
"of Windsor, in the county of Windsor, on the 8th day of
"March 1787, at Chatham, in the present county of Middle-
"sex, and State of Connecticut, by the Rev. Cyprian Strong,
"the settled minister of said Chatham, was duly joined in
"marriage with Miss Molly Bartlett, grand-daughter of Rev.
"Moses Bartlett of Chatham, and great-grand-daughter of
"Rev. Phinehas Fisk of Haddam, a young, amiable, and in-
"teresting maiden of Chatham; that in a few years after
"such intermarriage, the said Molly was attacked by a viru-
"lent and inveterate disease, by which her eye-sight was
"greatly impaired, and thereupon the said Elisha went about
"to employ other female help, meet for the upholding of his
"domestic establishment, and, to that end, engaged one Hopy
"Talbot of Pocatapaug Flats, spinster, to take up her resi-
"dence at the mansion house of said Elisha, to minister unto
"his wants and necessities as a house-keeper and hand-mai-
"den, and to stand to and perform the things needful in that
"behalf; that it was agreed between the said Elisha and the
"said Hopy, that, in lieu of all pecuniary compensation, the
"said Hopy, while in the said Elisha's employ, was to be
"provided with good and wholesome meat, drink, sufficient
"clothing, and comfortable lodging; that the said Hopy en-
"tered upon the discharge of her duties, and performed the
"same in such open and undisguised manner, that the said
"Molly was apprised of the nature of the whole contract be-
"tween said Elisha and Hopy, and, thereupon, the said Molly
"was seized with chronic spasms, attended with the lachrymose
"ophthalmy, and a sympathetic hysteria supervened, where-
"by she became totally blind, and the said Elisha was indu-
"ced to dismiss the said Hopy from his service, and in a
"short time thereafter, he employed Susanna Eastman, spin-
"ster, then commonly called Sukey Eastman, a milliner or
"tailoress of Hanover, in the State of New Hampshire, or
"thereabouts, now mistress Susanna Torrey of Windsor, in
"the county of Windsor," ('meaning the plaintiff,') "to sup-
"ply the vacancy in the said Elisha's household, occasioned

" by the discharge of the said Hopy, and to perform the
" same services as the said Hopy, upon the same terms, and
" to be unto the said Elisha, in all things, as the said Hopy
" had been ; and that said Susanna," ('meaning the plaintiff,')
" in such way and manner, under such contract, engagement,
" agreement, and understanding, remained in the household
" of the said Elisha, supplying the place of Hopy Talbot of
" Pocatapaug Flats, until the decease of the siad Elisha, in
" 1819," (' meaning thereby that the plaintiff was not law-
' fully married to the said Elisha, but unlawfully lived and co-
' habited with him the said Elisha in pursuance of a mere-
' tricious contract and understanding, and in a state of
' adultery.')

" The bill further states, that the said Elisha made his
" will, dated the 16th day of March 1819, and thereby, af-
" ter giving a pecuniary legacy unto his wife Molly, intended
" as a full provision for her, in lieu of dower, and all claim
" to his estate as widow ; and after giving other pecuniary
" legacies, gave, devised and bequeathed all the remain-
" der and residue of his estate, both real and personal, unto
" Charles Bartlett Phelps, Francis Eastman Phelps, Edward
" Elisha Phelps, Laura Amelia Phelps, now Mistress Laura
" Amelia Emerson, Susan Maria Phelps and the oratrix,"
(' meaning the said Mary Almira Phelps') " and to their
" heirs forever, to be equally divided among them ; and he
" appointed Susanna Eastman, now Mistres Susanna Torrey,
" then some times called Susanna Phelps," (' meaning the
' plaintiff,') " by the name of Susanna Phelps and Robert
" Lord, executrix and executor of said will, and that said
" Elisha departed this life, on or about the 19th day of April,
" 1819, leaving Charles Bartlett Phelps, his heir at law, and
" the oratrix then being about five years of age."

" The bill further states, that said will was duly proved,
" and that after payment of the just debts of the testator,
" and the particular legacies, there remained in the hands of
" said executor and executrix," (' meaning the plaintiff,')
" a large property, amounting to about sixty thousand dol-
" lars, to be divided among the residuary legatees and devi-
" sees."

" The bill further states, that said Susanna," (' meaning
' the plaintiff,') " contriving by sheer craft, to cut off a large

"part of the oratrix" ('meaning the said Mary Almira's')
"just distributive share, of the residue, and to leave her
"only a remnant thereof; and having assumed the family
"name of the testator, began to give out in speeches that
"she had been lawfully married to the testator, and to claim,
"that, as his widow, she" ('meaning the plaintiff,') "was
"entitled to dower in his estate, and also entitled to have as-
"signed to her one full third of all his personal property,
"and so the said Susanna Eastman, spinster, now Mistress
"Torrey," ('meaning the plaintiff,') "by divers artful, cun-
"ning, and fraudulent pretences and representations, and by
"much subtle, crafty and deceitful simulations, procured di=
"vers large and valuable tracts of land, situated in said
"Windsor, being part of the testator's estate, to wit, the
"Parmele meadow, lying along the Connecticut river, the
"mansion house of the testator with the adjacent grounds,
"situate near the state prison, and a piece of land on Nose
"hill, to be set off to her, by the name of Susanna Phelps, as
"widow of the testator, for dower, by Abner Forbes, Samuel
"Shuttleworth and Luther Mills, a committee appointed by
"the judge of probate, for the district of Windsor, on the
"mere motion of the said Susanna," ('meaning the plain-
'tiff,') "pretending to be the widow of the testator, and in
"like manner, procured one full third part of all said testa-
"tor's personal property to be assigned to her, as aforesaid,
"by the same committee aforesaid," ('meaning and insinua-
'ting thereby, that the plaintiff, by sheer craft, and falsely
'pretending to be the widow of the said Elisha, fraudulently,
'deprived her said daughter Mary Almira of a large part of
'her just distributive share in the estate of the said Elisha,
'and deceitfully procured the same to be set off and assigned
'to her, the plaintiff, as dower.')

"The bill further states, that said Susanna," ('meaning
'the plaintiff,') "ever since said fraudulent endowment has
"enjoyed all said real and personal property, assigned as
"aforesaid, as her own; that the oratrix, at the time of such
"assignment, was an infant, only five years old, and that
"said assignment is wholly void and inoperative at law, and
"in equity."

"The bill further states, that the said Molly, the testator's
"real widow, has accepted her legacy in full satisfaction of

" dower; that Susan Maria Phelps, one of the devisees, de-
" ceased about the year 1829, leaving her heirs at law and
" personal representatives, without the jurisdiction of this
" court; that Laura Amelia Phelps, another devisee, about
" the year 1826, intermarried with Rufus Emerson, and that
" the orator and oratrix intermarried on the 15th day of Oc-
" tober, 1832.

" The bill insists that said Susanna," ('meaning the plain-
' tiff,') " ought to be holden as trustee of said property as-
" signed to her, for those entitled to the residue, under the
" will; and it further states a request to said Susanna, to
" come to an account of said property; but that said Susan-
" na," ('meaning the plaintiff,') " having threatened to
" ' make war upon the oratrix, and to exclude from society
" both the orator and oratrix, and to blacken their charac-
" ters, if she could,' resorts to very many pretences, subter-
" fuges and thread-bare shifts; and sometimes she denies
" that the testator ever made any such will as is before sta-
" ted, whereas the contrary is charged in the bill; at other
" times the said Susanna pretends that she does not hold
" any of the estate of the testator in her hands, whereas the
" bill charges that she has holden, and still holds, the land
" and personal property unjustly assigned as aforesaid, and
" that the yearly value of said lands was, and is not less than
" five hundred dollars, and that the value of said personal
" property was not less than twelve thousand dollars. At
" other times said Susanna admits that she holds said real
" and personal estate, but then she pretends that she was the
" lawful wife of the said testator, that said real and personal
" estate was justly assigned to to her, as widow of the testa-
" tor, and, in order to give color to such pretence, said Susan-
" na sometimes denies that the said Elisha was ever married
" to Molly Bartlett at all; at other times she admits that a
" ceremony of marriage was had between the said Elisha and
" the said Molly, before the Rev. Cyprian Strong, but then
" she," ('meaning the plaintiff,') " sometimes says, that said
" Elisha was induced apparently to consent to said ceremo-
" ny, by reason of the threats, violence, and actual bodily
" force of said Molly, and, therefore, that said ceremony, for
" such cause, was void. At other times the said Susanna
" pretends that such ceremony was void by reason of the fraud

"and circumvention of said Molly and her confederates, but
"wherein the said fraud and circumvention consist,or who the
"said confederates were, the said Susanna declines to speci-
"fy and set forth ; and sometimes the said Susanna pretends
"that said Elisha, previously to said ceremony before the
"Rev. Cyprian Strong, had become acquainted with Hopy
"Talbot of Pocatapaug Flats ; that they had been placed by
"their respective guardians, in their childhood, as pupils at
"the free school at Hugamum Hollow, where they began to
"take pleasure in each other, and to give indications thereof,
"in such manner as to leave no doubts upon their minds of
"an attachment ; that they formed a matrimonial engage-
"ment with each other, of which there were repeated con-
"firmations, especially after said ceremony, and the sickness
"of the said Molly ; that said Elisha and Hopy were known
"and notorious lovers, betrothed and affianced to each oth-
"er, with the full knowledge, consent, and approbation of all
"and singular, the guardians, brothers, sisters, aunts, and
"cousins of the parties, and that said ceremony before the
"Rev. Cyprian Strong, having been in open violation and
"clear derogation of such solemn engagement and pre-con-
"tract of said Elisha with the said Hopy Talbot of Pocata-
"paug Flats, was a perfect nullity.   At other times, the said
"Susanna gives out in speeches, that the said ceremony was
"of no effect, because the same was had privately in the
"town of Chatham, without the knowledge, consent, or ap-
"probation of said Elisha's mother, brothers, or sisters, then
"residing in Green Woods, forty miles distant from Chatham;
"and the said Susanna also lays great stress on the pretence,
"that there was no publication of banns before such ceremo-
"ny, and declares the same, for that reason, invalid ; and,
"moreover, the said Susanna pretends that, although said
"ceremony was binding to all intents and purposes upon the .
"said Molly, there was a condition, proviso, or reservation
"on behalf of said Elisha, that said ceremony should be
"considered a mere nullity, unless he, at some indefinite time
"thereafter, should elect to consider it valid, and that he
"never did, at any future time, elect to consider it valid, of
"which said Molly had notice, whereby said ceremony be-
"came, *ipso facto*, null ; and the said Susanna also insists
"on this head, that said Elisha and said Molly did, at some-

WINDSOR,
February,
1838.

Torrey
v.
Field.

" time, take leave of each other as forever, whereby said cer-
" emony was fully dissolved ; and the said Susanna also, at
" many times, pretends that said ceremony was and is of no
" validity or avail whatsoever, in law and equity, because
" she says there was no corporal consummation thereof, and
" this the said Susanna saith the more boldly, because she
" knoweth that the commission of corporal consummation
" cannot be directly proven by eye witnesses. And the said
" Susanna has employed very many agents and aged attor-
" neys to go about from place to place, to give utterance to
" the pretences aforesaid, and to publish and declare the said
" ceremony of marriage, before the Rev. Cyprian Strong, for
" and on account of such pretences, to be utterly void, frus-
" trate, and of no effect, whereas the bill charges that said
" ceremony was to all intents and purposes, in fact, and of
" right, a perfect, legal, and valid marriage, and so it will
" appear whenever it shall be brought to trial.

" At other times the said Susanna insists on the fact, that
" the said legacy to the said Molly, in the will of the testator,
" was given to her by the name of Molly Bartlett, as evidence
" that the testator did not recognize her as his wife, whereas,
" the bill charges, that, as the oratrix, in her infancy, was a
" great favorite with the testator, by reason of her early de-
" velopement of character and inclinations like his own, that
" he stood god-father for the oratrix, and, as a mark of spe-
" cial grace, gave her, at the baptismal font, the name. of his
" wife," (' meaning the said Molly,') " for which said Su-
" sanna," (' meaning the plaintiff,') " has always borne the
" oratrix particular spite and ill will, and that the testator be-
" queathed said legacy to his wife," (' meaning the said Mol-
' ly,') " by the name of Molly Bartlett, being the name by
" which he used to address her in terms of soft dalliance, in
" order 'the better to distinguish her from the oratrix, whose
" name also occurs in said will.

" At other times, the said Susanna, admitting that there
" was a good and valid marriage between said Elisha and
" Molly, pretends, that afterwards a divorce was granted un-
" to said Molly, upon her petition, for and on account of the
" acts of adultery of said Elisha, at different times, with dif-
" ferent women, and that after such divorce granted, said
" Elisha and said Susanna intermarried, whereas the bill, by

" charge, denies that a divorce was ever petitioned for by,
" or granted to said Molly, and also charges, that if any writ-
" ten petition was made, or divorce granted, the same was
" procured by the deception, imposition, unfair means and
" practices of said Elisha and Susanna, and, as evidence
" thereof, the bill charges that, at the date of such pretend-
" ed petition, and for a long time before, said Molly was and
" had been of feeble health, severely afflicted with fits, wholly
" blind, and, therefore, unable to read and write, and incapa-
" ble of doing any business, whatever ; that said Elisha pro-
" cured the draft of said pretended petition at the instance
" of the said Susanna, who was then living with him, as the
" successor of Hopy Talbot of Pocatapaug Flats, and with-
" out the direction, consent, or knowledge of said Molly,"
('thereby meaning that, while the said Molly Bartlett was the
' lawful wife of the said Elisha Phelps, the plaintiff lived
' with the said Elisha, in a state of adultery, and deceitfully
' and unfairly influenced him to procure the draft of a false
' and unwarrantable petition of the said Molly, for a divorce
' from the said Elisha ;')—" that the said Elisha carried the
" said draft to said Molly, and while she was alone with him,
" without the advice, counsel, or support of any of her
" friends, he made many artful representations and persua-
" sions, to induce her to sign said pretended petition ; that
" the said Elisha threatened the said Molly, that unless she
" would sign such pretended petition, he would forever aban-
" don her, go without the State of Connecticut, associate
" with a harlot, and resort and dwell with said harlot in pla-
" ces remote from said Molly, and where he would indulge
" in bigamy and adultery, and all manner of unlawful lusts,
" with impunity ; and the said Elisha also represented, that
" he had taken professional counsel, particularly of an attor-
" ney of great eminence, skill, and practice, in cases of pros-
" titution, and had by the said attorney been advised, that
" he might cohabit with a harlot whensoever he would, and
" be most triumphantly acquitted of all and every criminal
" prosecution therefor ; and that said Elisha, unmoved by
" the tears and supplications of said Molly, and led by evil
" passions, artfully excited by said Susanna, also threatened
" to sell all his property and effects, and escape with his har-
" lot beyond seas, leaving the said Molly without home

WINDSOR,
February,
1838.

Torrey
v.
Field.

" or shelter, and doomed to wander, a blind beggar, on the
" earth ; and that, further to induce said Molly to sign said
" pretended petition, the said Elisha offered to convey, by
" way of settlement, to her own use, the garden spot, house
" and furniture, at Chatham, where the said Molly might
" dwell in peace and solitude ; and so the bill charges, that
" if said Molly did sign such pretended petition, she signed
" the same in great anguish and distress of mind, under the
" influence of the artful and fraudulent representations and
" persuasions, and the threats and menaces aforesaid, with-
" out free agency or consent, in the presence, by the express
" requirement, and under the duress of her husband, the
" said Elisha, whom she was by her duty bound to obey.

" And the bill further charges, that said Molly never gave
" any order, instruction, or consent, to or for the prosecution
" of such pretended petition, nor did the said Molly, in any
" way or manner, countenance, approve, consent to, or know
" of said pretended divorce.

" And the bill moreover charges, that the said Elisha, be-
" ing moved and seduced by the wanton and lascivious blan-
" dishments of said Susanna, who was then, by her craft, con-
" triving to make breaches between the said Elisha and his
" wife Molly, and also making shift to patch up an unseemly
" and unholy alliance with the said Elisha, did, with the know-
" ledge, and at the pressing instance of the said Susanna,
" employ counsel to prosecute said pretended petition, in the
" name of said Molly, caused depositions, proving the acts of
" adultery of said Elisha with said Susanna and other wo-
" men, to be taken and read in open court, before which
" said pretended petition was pending, and in fraud of said
" Molly, of the law, of the marriage relation, and of good
" morals, procured such pretended divorce to be granted un-
" to said Molly."—(' thereby meaning that the plaintiff, hav-
' ing been guilty of the crime of adultery with the said Eli-
' sha, moved and seduced him to take depositions, proving
' her said adultery with him, in order to effect a divorce be-
' tween him and his wife, in fraud of his said wife, and of
' the law, and against good morals.'

" And under the circumstances aforesaid, the bill charges
" that the said pretended divorce, having been wrongfully
" and unjustly procured, in the name of said Molly, by the

" duress, menaces, covin, collusion, fraud, and circumvention,
" as well of said Susanna as of said Elisha, without the con-
" sent or knowledge of said Molly, and while she was blind,
" sick, and disordered, and under the entire dominion and
" control of her husband, the said Elisha, is, and ought to
" be holden, in law an equity, null and void, and utterly frus-
" trate, and of no effect ; and the bill insists, that by, and
" under the laws of the State of Connecticut, where such
" pretended divorce was granted, the said Elisha could not
" lawfully marry, or be married again, by reason of any di-
" vorce granted unto said Molly, for the acts of adultery of
" the said Elisha. The bill also charges, that the said Elisha
" and Susanna never did intermarry, after the date of such
" pretended divorce, and that their cohabitation was, in its
" inception and continuance, altogether meretricious and un-
" lawful.

" At other times the said Susanna, conceding that she
" never was the lawful wife of the said Elisha, pretends that
" she had been his servant for many years, faithfully minis-
" tering unto his wants, and that his estate was justly indebt-
" ed to her, for her wages in that behalf, in a sum equal to
" the property assigned to her, as aforesaid ; whereas the bill
" charges, that she was taken into his service, as a substitute
" for, and on the same terms as Hopy Talbot of Pocatapaug
" Flats, that said Hopy was to be well fed, sufficiently
" clothed, and warmly and comfortably lodged, in lieu of all
" pecuniary compensation, and that said Susanna was well
" provided with sufficient meat, raiment and comfortable
" lodging, to as great a degree as Hopy Talbot of Pocata-
" paug Flats, according to the original contract, agreement and
" understanding in that behalf,"—(' thereby again meaning
' and insinuating, and intending to have it understood and be-
' lieved, that the plaintiff lived and cohabited with the said
' Elisha Phelps, in the character and condition of a kept
' mistress and concubine, in pursuance of a wicked and
' unlawful agreement for that purpose.

" The bill further states, that the said Susanna has got-
" ten into her hands, and refuses to show the books and pa-
" pers of said Elisha, particularly an ancient family bible,
" wherein he was wont to make memorandums from time to
" time, touching the changes of his household, and she sets

" the orator and oratrix at defiance; and the bill further " states, that on or about the first day of January last, appli- " cation was made unto Charles Bartlett, Francis Eastman, " Edward Elisha, Rufus and Mistress Laura Amelia, his wife, " and they were each required to consent that their names " be inserted in this bill, as parties complainants, and they " refused their consent thereto."

"The bill prays for the answer of the defendants and for " relief; that the doings of the committee, and the order " and decree of the judge of probate, for the district of " Windsor, setting off a part of said testator's estate to said " Susanna, may be decreed to be null and void, that said Su- " sanna may be decreed to be a trustee of all such estate for " those entitled to the residue under said will, that an ac- " count may be taken of all the personal property assigned " to said Susanna, and of the clear rents and profits of said " tracts of land, while possessed by her, under such assign- " ment, and that the oratrix may receive one sixth part of " the gross amount, with legal interest, and that the orator " may be let into the possession of one sixth part of said " tracts of land, assigned as aforesaid, and that other and " further relief, suitable to the case, may be granted."

" For as much as it is suggested, that Charles Bartlett " Phelps, one of the defendants, resides beyond the jurisdic- " tion of the court, and without the state of Vermont, it is " ordered that the substance of the foregoing bill and this " order be published in the Bellows Falls Intelligencer, prin- " ted at Bellows Falls, in said county of Windham, three " weeks successively, the last of which publications to be at " least four weeks before the next term of the supreme court " of the state of Vermont, to be holden at Newfane, within " and for Windham county, on the third Tuesday next after " the fourth Tuesday of January next, and which publica- " tion shall be taken as sufficient notice to said Charles " Bartlett Phelps, to appear at said term of said court, and " answer the foregoing bill."

" Given under my hand at Newfane, this 11th day of " April, Anno Domini eighteen hundred and thirty-four."

" SAMUEL S. PHELPS,
" Chancellor."

The declaration concluded to the damage of the plaintiff $10,000.

The defendant pleaded the general issue, and the ten following special pleas in bar, to wit ;—

*First plea.*

And for further plea in this behalf, by leave, &c., the defendant says, that the said Susanna ought not to have, &c., because he says, that long before the committing of the said supposed grievances, in the several counts of said Susanna's declaration mentioned, or any of them, one Doctor Elisha Phelps, late of Windsor, in the county of Windsor, now deceased, formerly of Chatham, in the county of Middlesex, and State of Connecticut, and anciently of Greenwoods, in the county of Litchfield, and State of Connecticut, on the 8th day of March, 1787, at Chatham aforesaid, was duly joined in marriage with Miss Molly Bartlett of said Chatham, and thereafter, during all the natural life of said Elisha, said Molly continued to be his lawful wife, and, upon his decease, became and now is his widow. And the defendant further says, that in a few years after the intermarriage of said Elisha and said Molly, to wit, on the 9th day of Dec. 1791, at said Chatham, the said Molly was seized with a violent and inveterate disease, attended with an acute pain in the back part of the head, and loss of reason, whereby she became blind, and has thereafter continued blind hitherto. And the defendant further says, that thereupon, to wit, on the 9th day of June, 1792, at said Chatham, the said Elisha employed one Hopy Talbot of Pocatapaug Flats, spinster, to take up her residence at the mansion house of said Elisha, to minister unto his wants and necessities as a house-keeper and hand-maiden, and to stand to and perform the things needful in that behalf, and that it was well agreed between said Elisha and said Hopy, that in lieu of pecuniary compensation, she was to be provided with meat, drink, clothing, and lodging, and that said Hopy, under such contract, and in such service, remained in the household of said Elisha for a space of time, and until she was obliged to quit the same, to wit, on the 9th day of Dec. 1794. And the defendant further says, that in a short time thereafter, to wit, on the 9th day of August, 1797, to wit, at Hanover, in the State of Newhampshire, the said Elisha employed said Susanna, then commonly called Sukey Eastman, and then being a tailoress, and a spinster of said Hanover, to supply the place of said

Hopy, to perform the same services, upon the same terms, and to be unto the said Elisha, in all things as the said Hopy had been. And the defendant further says, that, thereupon, said Susanna did abide and cohabit with said Elisha from that time forward, until the decease of the said Elisha in 1819, and during all that time did have unlawful, meretricious, irreligious, and sinful intercourse, connection, and copulation with said Elisha.

And the defendant further says, that said Susanna, being a woman of talents, and of great show of piety, virtue, and respectability, did, to wit, at Hanover aforesaid, in the tailor's-shop of one George Walton there situate, and in a certain bed-room adjacent thereto, to wit, on the 9th day of September, 1797, in the night time, and at divers other times and places, by many wanton and lascivious blandishments, and by divers artful and wicked practices, tempt, stir up, incite, seduce, instigate, provoke, and persuade said Elisha, unlawfully and wickedly to get and procure a false, fraudulent, covinous and collusive bill of divorce, wrongfully and unjustly dissolving the marriage between said Elisha and said Molly, to the end that said Susanna and said Elisha might have their intercourse, connection, and copulation together, under the false and feigned color, guise, and pretence of lawful, holy, and sacred matrimony. And the defendant further says, that the said Elisha, being moved and seduced by the instigation of said Susanna, did, to wit, on the 9th day of Jan. 1798, to wit, at Middletown, in the county of Middlesex, and State of Connecticut, cause, and procure to be drafted, a paper writing, directed to some one of the judicial courts of the State of Connecticut, and purporting to be a petition of Molly Phelps, for a divorce from Elisha Phelps, for and on account of the acts of adultery of said Elisha, at different times and places, with different women. And with the said paper writing, the said Elisha did, then and there, repair unto the said Molly, and while she was alone with him in a private apartment, away from the advice, counsel, or support of any of her friends, he set about causing and inducing said Molly to sign said paper writing. And the said Elisha, unmoved by the sighs and tears and supplications of said Molly, utterly regardless of her pitiable condition and his marital duty, and inflamed with impure, unho-

ly, and unchaste desires, artfully excited by said Susanna, did, then and there, threaten the said Molly, that unless she would sign said paper writing, he would forever abandon her, without any the least provision for her support, and that he would fly with said Susanna beyond seas, and live with her in whoredom and prostitution. And the said Elisha, then and there, offered to convey unto the use of said Molly a piece of land in Barkhamstead, and a venerable mansion-house in Chatham, then more than ninety years old, and sundry notes and book accounts, together with some household furniture, if the said Molly would sign the said paper writing.

And the defendant further says, that said Molly, in tears and great distress, being blind, and unable to read or write, under the influence of the fraudulent representations and persuasions, and the barbarous and inhuman threats and menaces of the said Elisha, instigated by said Susanna, was induced and compelled, in the presence, and by the express requirement of said Elisha, without any free and voluntary agency or consent, on her part, to suffer her name to be set to said paper writing. And the defendant further says, that said Molly never gave any order, consent, or instruction to, or for the prosecution of said paper writing, as and for a petition for divorce, nor did the said Molly, in any way or manner, countenance, approve, consent to, or know of any divorce of said Molly from said Elisha.

And the defendant further says, that the said Elisha, in further pursuance of the vile, wicked, and irreligious tempting and instigation of said Susanna, did, thereupon, to wit, on the 9th day of Jan. 1798, at Middletown aforesaid, employ counsel to enter said paper writing on the files of one of the judicial courts of the State of Connecticut, as and for a petition of said Molly, for a divorce from said Elisha, and as such petition, to prosecute said paper writing before said court, in the name of said Molly, caused depositions, proving the acts of adultery of said Elisha with said Susanna, to be taken, and read in open court, before which said paper writing was pending, as and for a petition for a divorce, and in fraud of said Molly, of the law, of the marriage relation, and of good morals, procured some sort of a judicial decree to be made by said court, purporting to divorce said Molly from said Elisha, to wit, on the 15th day of August,

1798, to wit, at Middletown aforesaid. And so the defendant says, that the said judicial decree, having been wrongfully and unjustly procured, in the name of said Molly, by the duress, menaces, covin, collusion, fraud and circumvention, as well of said Susanna as of said Elisha, without the consent or knowledge of said Molly, and while she was blind, sick, disordered, and under the entire dominion and control of said Elisha, her husband, is, and ought to be holden, in law and equity, by the laws of God and man, null and void, and utterly frustrate, and of no effect.

WINDSOR,
February,
1838.

Torrey
v.
Field.

And the defendant further says, that the said Susanna, afterwards, to wit, on the 9th day of Dec. 1798, to wit, at Rochester, in said county of Windsor, did pretend, and from thence hitherto, wrongfully, basely, and wickedly has pretended, that the paper writing aforesaid was a free and voluntary petition of said Molly for a divorce of said Molly from said Elisha, and that said unjust and wrongful judicial decree was a good, valid, and lawful divorce of said Molly from said Elisha, fully dissolving said marriage between them.

And the defendant further says, that on the 16th day of March, 1819, the said Elisha made his last will and testament in writing, and thereby, after giving certain pecuniary legacies, he gave, and devised, and bequeathed, all the remainder and residue of his estate, both real and personal, unto Charles B. Phelps, Francis E. Phelps, Edward E. Phelps, Laura Amelia Phelps, Susan Maria Phelps, and Mary Almira Phelps, and to their heirs, to be equally divided among them, and that said Elisha departed this life on the 19th day of April, 1819, leaving the said Charles B. Phelps his heir at law, and said Mary Almira Phelps, being then only five years old.

And the defendant further says, that, thereupon, on the 9th day of Jan. 1820, to wit, at Windsor aforesaid, the said Susanna, contriving by her sheer craft to cut off a large part of said Mary Almira's just distributive share of said residue, and to leave her only a remnant thereof, did falsely pretend to be the widow of said Elisha, and having assumed the family name of said Elisha, did claim to be endowed in his estate, and, by such false pretence, did cause and procure divers large and valuable tracts of land, situate in said Windsor, being part of the estate of said Elisha, to wit, the Parmele meadow, lying along Connecticut river, the mansion

Windsor,
February,
1838.
———
Torrey
v.
Field.

house of the testator, situate near the state-prison, and a piece of land on Nose hill, to be set off to her as dower, and in like manner one-third part of said testator's personal property to be assigned to her as widow, under an order of the judge of probate for the district of Windsor, on the mere motion of said Susanna, falsely and fraudulently pretending to be the widow of the said Elisha,

And the defendant further says, that on the 15th day of October, 1832, at Putney, in the county of Windham, he intermarried with said Mary Almira Phelps, and thereby became, and still is well entitled, at law and in equity, in right of his said wife, as a residuary devisee and legatee, under the will of said Elisha, to one-sixth part of the lands and personal estate, so wrongfully and illegally set off to said Susanna, as aforesaid.

And the defendant further says, that Susan M. Phelps, one of the said residuary legatees and devisees, departed this life on the 11th day of June, 1829, to wit, at Montreal in the Province of Canada, leaving her heirs at law, and personal representatives there and beyond the jurisdiction of the court of chancery, of the state of Vermont.

And the defendant further says, that Laura Amelia Phelps, another of the said residuary devisees and legatees, intermarried with Rufus Emerson, to wit, on the 9th day of December, 1826, at Windsor aforesaid.

And the defendant further says, that afterwards, to wit, on the 1st day of January, 1834, to wit, at Windsor aforesaid, the defendant and Mary Almira, his wife, did apply unto Charles B. Phelps, Francis E. Phelps, Edward E. Phelps, Rufus Emerson and Mistress Laura Amelia, his wife, and require them and each of them, to consent that their names be joined as parties complainants along with the defendant and said Mary Almira, his wife, in a suit to vacate and avoid the said Susanna's dower and assignment, aforesaid, and to distribute the same among the residuary legatees, and devisees aforesaid, and they would not consent thereto.

And the defendant further says, that afterwards, on the 11th day of April, 1834, at Newfane in the county of Windham, the defendant and Mary Almira his wife, for the purposes of obtaining a discovery from said Susanna, of her right and title to the dower and assignment so set out to her, as

aforesaid, to vacate and avoid the same and to recover the just and equitable portion of said Mary Almira, as a residuary devisee and legatee as aforesaid, did commence and institute their suit in chancery, against said Susanna, Francis E. Phelps, Edward E. Rufus and Mistress Laura Amelia his wife, and Charles B. Phelps, and therein did address unto the honorable court of chancery of the state of Vermont, having competent jurisdiction in this behalf, their *English bill,* in the words and figures following.

[Here follows a copy of the bill, in favor of the defendant and the said Mary Almira, the publication of the substance of which was the alleged libel.]

And thereupon on the 11th day of April, 1834, at Newfane in the county of Windham, the Hon. Samuel S. Phelps one of the chancellors of the court of chancery, of the state of Vermont, on inspection of said English bill, and an motion of the defendant, did make his order, underneath the said English bill, according to the rules and course of practice of said court of chancery, in the words and figures following ;—

" For as much as it is suggested, that Charles B. Phelps, " one of the defendants, resides beyond the jurisdiction of " the court, and without the state of Vermont, *It is ordered,* " that the substance of the foregoing bill and this order be " published in the Bellows Intelligencer, printed at Bellows " Falls in the county of Windham, three weeks successively, " the last of which publications to be at least four weeks " before the next term of the supreme court, of the state of " Vermont, to be holden at Newfane, within and for Wind- " ham county, on the third Tuesday next after the fourth " Tuesday of January next, and which publications shall be " taken as sufficient notice to said Charles B. Phelps, to ap- " pear at said term of said court, and answer the foregoing " bill."

" Given under my hand at Newfane, this 11th day of April, " Anno Domini, eighteen hundred and thirty four."

" SAMUEL S. PHELPS,

" Chancellor."

And the defendant further says, that afterwards, to wit, on the 17th day of May, 1834, to wit, at Rockingham in the county of Windham, he, the defendant, in obedience to said

order, and by virtue thereof, and not otherwise, did compose and cause to be published, the said supposed libellous matters, in the several counts of the said Susanna's declaration mentioned, said publication in all its parts being the substance of said English bill and the order aforesaid, in the Bellows Falls Intelligencer, printed at Bellows Falls, in the county of Windham, as he might lawfully do, and was bounden to do, under the order aforesaid, the said composing and publishing being after the date of said English bill and said order, and the several matters and things, herein before alleged. Which is the same composing and publishing whereof the said Susanna has, in the several counts of her declaration, complained against him, with this, that the defendant will verify, that all and every of the imputations upon said Susanna, contained in said publication, are just and true. And this the defendant is ready to verify, wherefore he prays judgment, if the said Susanna ought to have or maintain her said action thereof, against him, &c.

*Second plea.*

And for further plea in this behalf by leave, &c., agreeably to the statute, &c., the defendant says, that said Susanna ought not to have or maintain her said action against him, because he says that, before the committing of the said supposed grievances in the several counts of the said Susanna's declaration mentioned, or any of them, to wit, on the 15th day of October, 1832, at Putney in the county of Windham, the defendant intermarried with one Mary Almira Phelps.

And the defendant further says, that the said Mary Almira, having, in a short time after such intermarriage, by the procurement of said Susanna, resorted unto the city of Boston, without this state, and having adopted there a style of living of costly and extravagant splendor and magnificence, and having run up very considerable bills for her wardrobe, gowns and fine linen, at the shops of milliners and dressmakers, (which said bills were in due time presented unto the defendant for payment,) and having taken an expensive voyage beyond seas unto the French dominions, by all which said Mary Almira began to be considerably pinched and straitened in her circumstances;—

The defendant, before the committing of the said supposed

grievances or any of them, to wit, on the 1st day of December, 1833, to wit, at said Windsor, set about making and did make a faithful inquiry of divers good and worthy citizens, as well neighbors of said Susanna as others, and among sundry records and documents and other written evidences, in order honestly and truly to ascertain the amount and situation of the property and estate of said Mary Almira, before her intermarriage with the defendant, to the end that the same might be gathered together, and at a proper time and in a proper manner to be applied unto the support and subsistence of said Mary Almira.

And the defendant further says, that upon such inquiry, he ascertained, that one Doct. Elisha Phelps, late of said Windsor, deceased by his last will and testament in writing bearing date the 16th day of March, 1819, after giving certain pecuniary legacies, gave, devised and bequeathed all the residue and remainder of his estate, both real and personal, unto C. B. Phelps, F. E. Phelps, E. E. Phelps, Susan Maria Phelps, Laura A. and said Mary Almira, and to their heirs forever, to be equally divided among them, and that said testator departed this life, on the 19th day of April, 1819.

And the defendant further says, that, upon such inquiry, as aforesaid, he further ascertained that said Susanna, immediately after the decease of the said Elisha, claimed and pretended to be his widow, and procured to be assigned and set off to her, as such widow, under an order of the judge of probate of the district of Windsor, divers large and valuable tracts of land, belonging to the estate of the testator in Windsor, to wit, the Parmele meadow lying along Connecticut river, the mansion house of the testator, situate near the state prison, and a piece of land on Nose hill, and also one full third part of all said testator's personal property, and that said Susanna thereupon took possession of said real and personal property and thereafter continued to hold and enjoy the same as her own.

And the defendant further says, that upon such inquiry, as aforesaid, he was informed, and had sufficient cause and good reason to believe and did believe that said Elisha, in his lifetime, and on the 8th day of March, 1787, was lawfully married unto Miss Molly Bartlett, who, thereafter, during all the natural life of the said Elisha, continued to be his

lawful wife, and upon his decease became, and now is his widow ;—and that said Susanna, well knowing said marriage to have been had and solemnized, between the said Elisha and said Molly, did, after the same, to wit, on the 9th day of August, 1797, to wit, at Peacham, in the county of Caledonia, and near the line of his British Majesty's dominions, and for a long space of time thereafter, to wit, twenty years, cohabit and have unlawful and meretricious connexion, intercourse and copulation with said Elisha.

And the defendant further says, that, upon such inquiry, he was further informed, and had good cause and sufficient reason for belief, and did believe, that said Susanna did and would set up many crafty pretences to avoid said marriage, particularly the compulsion, force and violence, fraud and circumvention of said Molly and her friends—the want of banns—a pre-contract with one Hopy Talbot of Pocatapaug Flats,—the clandestinity of the ceremony—the want of approbation of family friends, a reserved power of revocation on the part of said Elisha, and the want of consummation,—the said pretences being much used, accustomed and approved by the said Susanna.

And the defendant further says, that, upon such inquiry, as aforesaid, he further was informed and had good reason to believe, and did believe, that said Susanna did and would, in an especial manner insist, that said Molly, during the lifetime of said Elisha, had petitioned for a divorce, and had been lawfully divorced from said Elisha, by some one of the judicial courts of the state of Connecticut.

And the defendant further says, that upon such inquiry as aforesaid, he further was informed, and had good reason to believe and did believe, that said Molly never freely and voluntarily made any petition for a divorce from said Elisha, and that no divorce was ever properly or lawfully granted unto her ; that, after the intermarriage of said Elisha and Molly, she became, through the practice of said Elisha, wholly blind.

That afterwards, to wit, on the 9th day of August, 1797, to wit, at Hanover in the state of New Hampshire, the said Susanna did continue in the exercise of her craft, to despoil and rob the said Molly of the society, comfort and assistance of her said husband,—that said Susanna, to wit, on the 9th

day of August, 1797, in the night time, at said Hanover in WINDSOR,<br>February,<br>1838.
the tailors shop of one George Walton, there situate, and in a
certain bed room adjacent, and at divers other times and Torrey<br>v.<br>Field.
places, did, by many wanton and lascivious blandishments
and by sundry artful wiles and practices, tempt, stir up, in-
cite, seduce, instigate, provoke and persuade said Elisha to
desert and abandon said Molly, his wife, to live and cohabit
with said Susanna, and to get and procure a false, fraudu-
lent, covinous and collusive bill of divorce, wrongfully and
unjustly dissolving the said marriage between said Elisha and
said Molly,—to the end that said Susanna and said Elisha
might have their intercourse, connexion and copulation to-
gether under the false and feigned color, guise and pretence
of lawful, holy and sacred matrimony;—that the said Elisha
being moved by the instigation of the said Susanna did, to
wit, on the 9th day of January, 1798, to wit, at Middletown,
in the county of Middlesex and state of Connecticut, procure
to be drafted a paper writing, purporting to be a petition of
Molly Phelps, addressed unto one of the judicial courts of
the state of Connecticut, for a divorce from Elisha Phelps,
for and on account of the acts of adultery of said Elisha, at
different times and places, with different women, and with
said paper writing did repair unto said Molly, and, while she
was alone with said Elisha in a private apartment, away from
the advice, counsel or support of any of her friends, that he
set about coercing and inducing her to sign said paper wri-
ting, that he then and there threatened her that unless she
would sign said paper writing, he would forever abandon her
without any, the least provision for her support, and would
fly with said Susanna beyond seas, and live with her in
whoredom and prostitution ; that said Elisha offered to con-
vey unto the use of said Molly a piece of land in Barkham-
stead, and an old dwelling house in Chatham in the state of
Connecticut, and some notes and book accounts, together
with a quantity of household furniture, if she would sign
said paper writing ; and that said Molly, in tears and great
distress, being blind and unable to read or write, under the
influence of the fraudulent representations and persuasions
and the threats and menaces aforesaid, was induced and
compelled, in the presence and by the express requirement of
said Elisha without any free and voluntary agency, choice or

consent on her part, to suffer her name to be set to said paper writing.

And the defendant further says, that, upon such inquiry as aforesaid, he further was informed, and had good reason to believe, and did believe, that said Molly never gave any order, instruction, or consent, to or for the prosecution of said paper writing, as and for a petition for a divorce, and that she did not, in any way or manner, countenance, approve, consent to, or know of any divorce from said Elisha.

And the defendant further says, that, upon such inquiry as aforesaid, he further was informed, and had good reason to believe, and did believe, that the said Elisha, at Middletown aforesaid, on the said 9th day of Jan. 1798, in further pursuance of the instigation of the said Susanna, did employ counsel to enter said paper writing on the files of one of the judicial courts of the State of Connecticut, as and for a petition of said Molly, for a divorce from said Elisha, and, as such petition, to prosecute said paper writing, before said court, in the name of said Molly ; that after the date of said paper writing, the said Elisha, by concert with certain persons, whose names are yet unknown to the defendant, did cause said persons to look upon the said Elisha and the said Susanna, as they were lying in naked bed together, that the said Elisha, thereupon, caused to be taken the depositions of such persons, proving that he was thus seen in naked bed with said Susanna, procured such depositions to be read in open court, before which said paper writing was pending, as and for a petition for a divorce, and, upon such evidence, procured some sort of a judicial decree to be made by said court, purporting to divorce said Molly from said Elisha, to wit, on the 15th day of August, 1798, at said Middletown.

And the defendant further says, that, upon such inquiry as aforesaid, he further was advised, and had good reason to believe, and did believe, that said judicial decree, so procured as aforesaid, was the same divorce, and not other and different, set up and pretended by said Susanna, as fully dissolving the relation of marriage between said Elisha and said Molly, in the life-time of said Elisha, and that said judicial decree, having been wrongfully and unjustly procured in the name of said Molly, by the duress, menaces, covin, collusion, fraud, and circumvention, as well of said Susanna as of said

Elisha, without the consent or knowledge of said Molly, and while she was blind and feeble, and under the entire dominion and control of said Elisha, her husband, was, and would be holden, in law and equity, by the laws of God and civilized man, null and void, and utterly frustrate, and of none effect.

And the defendant further says, that, upon such inquiry as aforesaid, he further was informed, and' had good reason to believe, and did believe, that said Susanna, for the purpose of holding the property assigned to her as aforesaid, did and would set up and pretend a claim and right to remuneration for her services in the household of said Elisha during his lifetime, and, as executrix of the will of said Elisha, to retain said property, in satisfaction of her said claim.

And the defendant further says, that, upon such inquiry as aforesaid, he further was informed, and had good reason to believe, and did believe, that said Susanna was taken into the service of said Elisha, as a substitute for, and on the same terms as Hopy Talbot of Pocatapaug Flats, that said Hopy was, according to her agreement and understanding with said Elisha, to be provided with meat, clothing, and lodging, in lieu of pecuniary compensation, and that said Susanna, during the time of her remaining in the household of said Elisha, was provided with meat, clothing, and lodging, as largely and bountifully as said Hopy had been provided in that behalf.

And the defendant further says, that, upon such inquiry as aforesaid, he further was informed, and had good reason to believe, and did believe, that said Susanna had threatened to make war upon said Mary Almira, and had resolved, and as much as in her lay, endeavored to make an adulteress of said Mary Almira, and thereby to deprave, debase, and destroy her morals and her reputation.

And the defendant further says, that having, upon such inquiry and information as aforesaid, good reason to believe, and truly believing the several matters and things aforesaid, he did, before the committing of the said supposed grievances in said Susanna's declaration mentioned, or any of them, to wit, on the 11th day of April, 1834, to wit, at Newfane, in the county of Windham, commence and institute a suit in the court of chancery of the State of Vermont, in

WINDSOR,
February,
1838.

Torrey
v.
Field.

favor of the defendant and said Mary Almira, his wife, against said Susanna, Charles B. Phelps, Francis E. Phelps, Edward E. Phelps, Rufus Emerson and Laura A. Emerson, his wife, in order to obtain a discovery from said Susanna of her right and title to hold the property so wrongfully assigned to her as aforesaid, as widow of said testator, to vacate and set aside said assignment, the many false and fraudulent pretences of said Susanna notwithstanding, and to distribute the said property, so unjustly assigned, among the residuary devisees and legatees, under such testator's will, whereof said Mary Almira was one, and in the said suit the said defendant did address unto the chancellor of the said court of chancery, an English bill, in the name of the defendant and said Mary Almira, his wife, particularly setting forth their case in the premises, and praying for the gracious interposition of said court for their relief.

And the defendant further says, that afterwards, and before the committing of the said supposed grievances, in the several counts of said Susanna's declaration mentioned, or any of them, to wit, on the 11th day of April, 1834, at Newfane, in the county of Windham, the Hon. Samuel S. Phelps, one of the chancellors of the court of chancery of the State of Vermont, on inspection of said English bill, to the end that Charles B. Phelps, one of the defendants therein named, might have notice thereof, the said Charles B. Phelps residing beyond the jurisdiction of said court, and without the State of Vermont, did make his order underneath said English bill, according to the rules and course of practice of said court of chancery, and thereby ordered and directed that the substance of said English bill and the said order be published in the Bellows-Falls Intelligencer, printed at Bellows-Falls, in the county of Windham, three weeks successively.

And the defendant further says, that afterwards, to wit, on the 17th day of May, 1834, to wit, at Rockingham, in the county of Windham, he, the defendant, in obedience to said order, and by virtue thereof, and not otherwise, did compose, and cause to be published in the Bellows-Falls Intelligencer, printed at Bellows-Falls, in the county of Windham, the said supposed libellous matters, in the several counts of said Susanna's declaration mentioned, said publication, in all its parts, being the substance of said English bill and said order, as

he might lawfully do, and was bounden to do, under the order aforesaid, the said composing and publishing being after the date of said English bill and said order, and the several matters and things herein before alleged, which is the same composing and publishing whereof said Susanna, in the several counts of her said declaration, has complained against him, with this, that the defendant will verify that there is good reason to believe that all and every of the imputations upon said Susanna, contained in said publication, are true. And this the defendant is ready to verify, &c.

*Third plea.*

And for further plea in this behalf, by leave, &c. agreeably to the form of the statute, &c., the defendant says, that the said Susanna ought not to have, &c., because he says, that before the committing of the said supposed grievances, in the several counts of said Susanna's declaration mentioned, or any of them, to wit, on the 11th day of April, 1834, at Newfane, in the county of Windham, a certain suit in chancery, by English bill, in favor of the defendant and Mary Almira, his wife, against said Susanna, Charles B. Phelps, Francis E. Phelps, Edward E. Phelps, Rufus Emerson and Mistress Laura A. his wife, had been commenced in the court of chancery of the State of Vermont for said Windham county, and was then and there depending.

And the defendant further says, that thereupon, and before the committing of the said supposed grievances, in the several counts of the said Susanna's declaration mentioned, or any of them, to wit, on the 11th day of April, 1834, at Newfane, in the county of Windham, the Hon, Samuel S. Phelps, one of the chancellors of the court of chancery of the State of Vermont, to the end that Charles B. Phelps, a defendant named in said bill, and who resided without the State of Vermont, might have notice of the pendency of said suit, by English bill, did make his order, according to the rules and course of practice of said court of chancery, and thereby ordered and directed that the substance of said English bill and said order be published three weeks successively in the Bellows-Falls Intelligencer, printed at Bellows-Falls, in the county of Windham, the last of which publications to be at least four weeks before the then next term of said court of chancery for Windham county, on the 3d Tuesday

next after the 4th Tuesday of Jan. then next, as by the said English bill and the said order, now on the files of said court of chancery, duly authenticated copies whereof the defendant brings into court, will appear.

And the defendant further. says, that afterwards, to wit, on the 17th day of May, 1834, to wit, at Rockingham, in the county of Windham, he, the defendant, in obedience to said order, and by virtue thereof, and not otherwise, did compose, and cause to be published in the Bellows-Falls Intelligencer, printed at Bellows-Falls, in the county of Windham, the said supposed libellous matters in the several counts of said Susanna's declaration mentioned—said publication, in all its parts, being the substance of said English bill and said order, as he might lawfully do, and was bounden to do, under the order aforesaid, which is the same composing and publishing, &c., complained of, &c.   And this, &c.

*Fourth plea.*

And for further plea in this behalf, by leave, &c. agreeably to the form of the statute, &c., the defendant says, that the plaintiff ought not to have, &c., because he says, that, long before the committing of the said supposed grievances, in the several counts of the plaintiff's declaration mentioned, or any of them, one Doct. Elisha Phelps, late of Windsor, in the county of Windsor, deceased, formerly of Chatham, in the county of Middlesex, and State of Connecticut, and anciently of Greenwoods, in the county of Litchfield, and State of Connecticut, on the 8th day of March, 1787, at said Chatham, was duly joined in marriage with Miss Molly Bartlett, grand-daughter of Rev. Moses Bartlett, and great-grand-daughter of the Rev. Phinehas Fisk, a young, amiable, and interesting maiden of said Chatham, who, thereafter, during all the natural life of the said Elisha, continued to be his lawful wife, and, upon his decease, became, and now is, his widow.

And the defendant further says, that, in a few years after the intermarriage of said Elisha and said Molly, to wit, on the 9th day of December, 1791, at said Chatham, the said Molly was seized with a virulent and inveterate disease, attended with an acute pain in the back part of the head, and loss of reason, whereby she became blind, and has thenceforth continued blind hitherto.

WINDSOR,
*February*,
1838.

Torrey
*v.*
Field.

And the defendant further says, that, thereupon, to wit, on the 9th day of May, 1792, to wit, at said Chatham, the said Elisha employed one Hopy Talbot of Pocatapaug Flats, spinster, to take up her residence at the mansion house of said Elisha, to minister unto his wants and necessities, as a house-keeper and hand-maiden, and to stand to and perform the things needful in that behalf, and that it was well agreed between said Elisha and said Hopy, that in lieu of all pecuniary compensation, she was to be provided with meat, drink, clothing, and lodging, and that said Hopy, under such contract, and in such service, remained in the household of said Elisha for a space of time, and until she was obliged to quit the same, to wit, on the 9th day of December, 1794, at said Chatham.

And the defendant further says, that in a short time thereafter, to wit, on the 9th day of August, 1797, to wit, at Hanover, in the State of New Hampshire, the said Elisha engaged said Susanna, then commonly called Sukey Eastman, a spinster and tailoress of said Hanover, to supply the place of said Hopy Talbot, to perform the same services as the said Hopy, and to be unto said Elisha, in all things, as the said Hopy had been, and that, thereupon, said Susanna did abide and cohabit with said Elisha, from that time forward, until the decease of the said Elisha in 1819, and during all that time did have unlawful, meretricious, sinful, and irreligious intercourse, connection and copulation with said Elisha.

And the defendant further says, that said Susanna, well knowing that said Elisha was the lawful husband of said Molly, that said Molly was wholly blind, and entirely dependant upon the aid, support, and society of her said husband for her subsistence, comfort, and happiness through life, but contriving, and most wickedly and maliciously intending to blast the conjugal happiness of said Molly, to alienate the affections of said Elisha from his lawful wife, and to deprive said Molly of the said society, solace, and support of her said husband, did, to wit, on the 9th day of September, 1797, in the night time, to wit, at Hanover aforesaid, in the tailor's-shop of one George Walton there situate, and in a certain bed-room adjacent thereto, and at divers other times and places, by many wanton and lascivious blandishments,

and by divers artful and wicked wiles and practices, tempt, prompt, stir up, incite, seduce, instigate, provoke, and persuade the said Elisha to desert and abandon the said Molly, his wife, to live and cohabit with her, the said Susanna, and to get and procure a false, fraudulent, colorable, covinous, and collusive bill of divorce, wrongfully and unjustly dissolving the said marriage between said Elisha and said Molly, to the end that said Elisha and said Susanna might have their unlawful, meretricious, vile, and sinful intercourse, connection and copulation together, under the false and feigned color, guise, and pretence of lawful, holy, and sacred matrimony.

And the defendant further says, that said Elisha, being moved and seduced by the instigation of said Susanna, and in pursuance thereof, did, to wit, on the 9th day of Jan. 1798, to wit, at Middletown, in the county of Middlesex, and State of Connecticut, cause and procure to be drafted a paper writing, addressed to some one of the judicial courts of the State of Connecticut, and purporting to be a petition of Molly Phelps for a divorce from Elisha Phelps, for and on account of his acts of adultery, at different times and places, with different women, and with said paper writing did then and there repair unto said Molly to sign said paper writing, and that said Elisha, in further pursuance of the wicked, tempting instigation of said Susanna, unmoved by the sighs, tears, and supplications of said Molly, utterly regardless of her pitiable condition and his marital duty, for that he was inflamed with impure, unholy, and unchaste desires, artfully excited by said Susanna, did then and there threaten the said Molly, that unless she would sign said paper writing he would forever abandon her, without any the least provision for her support, and that he would fly with said Susanna beyond seas, and live with her in whoredom and prostitution, and the said Elisha also offered to convey unto said Molly a piece of land in Barkhampstead, and a venerable mansion house in Chatham, then more than 90 years old, together with some notes and book accounts, if said Molly would sign said paper writing, and that said Elisha, through the influence of such fraudulent representations and persuasions, and such barbarous and inhuman threats and menaces, instigated by said Susanna, did then and there induce and compel said

Molly, in tears and great distress, being blind, and unable to read or write, in the presence, and by the express requirement of said Elisha, without any free and voluntary agency, choice, or consent, on her part, to suffer her name to be set to said paper writing.

And the defendant further says, that said Elisha, in further pursuance of the vile, wicked, and irreligious tempting and instigation of said Susanna, did, thereupon, to wit, on the 9th day of Jan. 1798, at Middletown aforesaid, on his own mere motion, and at his own proper costs and charges, without any order, instruction, or consent of said Molly in that behalf, employ counsel learned in the law, to enter said paper writing on the files of one of the judicial courts of the State of Connecticut, as and for a petition of said Molly for a divorce from said Elisha, and as such petition, to prosecute said paper writing before said court, in the name of said Molly, caused depositions, proving the acts of adultery of said Elisha with said Susanna, to be taken and read in open court, before which said paper writing was depending, as and for a petition for a divorce, and, in fraud of said Molly, of the law, of the marriage relation, and of good morals, procured some sort of a judicial decree to be made by said court, purporting to divorce said Molly from said Elisha.

And the defendant further says, that said Susanna afterwards, to wit, on the 9th day of December, 1798, to wit, at Rochester in the county of Windsor, did pretend, and from thence hitherto, vilely, wickedly and basely has pretended, that the paper writing aforesaid was a free and voluntary petition of said Molly for a divorce from said Elisha, and that said unjust, and wrongful, judicial decree so procured as aforesaid, by the duress, menaces, covin collusion and circumvention of said Susanna and said Elisha, without the knowledge or consent of said Molly, and while she was blind, sick, disordered and under the entire control and dominion of said Elisha, her husband, was a good, valid, and lawful divorce of said Molly from said Elisha, fully dissolving the said marriage between them.

And the defendant further says, that said Elisha Phelps, on the 16th day of March, 1819, duly made and published his last will and testament in writing, and therein made and appointed certain persons, of whom Mary Almira Phelps, now

the lawful wife of the defendant, was and is. one, residuary devisees and legatees of his real and personal estate, and that said Elisha Phelps departed this life on the 19th day of April, 1819.

And the defendant further says, that said Susanna thereupon, to wit, on the 9th day of January, 1820, at Windsor aforesaid, contriving by her sheer craft to cut off a large part of said Mary Almira's just distributive share of the residue of said Elisha's real and personal estate, and to leave her only a remnant thereof, did falsely pretend to be the widow of said Elisha, did wrongfully assume and take to herself the family name of the testator, did claim to be endowed in his estate, and by such false pretence did cause and procure divers large and valuable tracts of land, situate in said Windsor, being part of the estate of the testator, to wit, the Parmele meadow, lying along Connecticut river, the mansion house of the testator, situate near the state-prison, and a piece of land on Nose hill, to be set off to her as dower, and in like manner, one third part of said testator's personal property to be assigned to her, as widow, under an order of the judge of probate for the district of Windsor, on the mere motion of the said Susanna, falsely and fraudulently pretending to be the widow of said testator—and that said Susanna immediately went into possession of said real and personal property, and hath ever since holden, possessed, and enjoyed the same, under such assignment, so fraudulently procured as aforesaid.

Wherefore the defendant, after the several matters and things before alleged, and at the times in the said Susanna's declaration mentioned, did compose, and cause to be published the said supposed libellous matters in said declaration mentioned, as he might well and lawfully do, for the cause aforesaid. And this, &c.

*Fifth plea.*

And for further plea in this behalf, by leave,&c. the defendant says, that said Susanna ought not to have or maintain her said action against him, because he says, that true it is,that long before the committing of the said supposed grievances in the said Susanna's declaration mentioned, or any of them, all and singular the matters and things, stated and set forth in the said

WINDSOR,
February,
1838.

Torrey
v.
Field.

supposed libellous publications in the said Susanna's declaration mentioned, did occur and take place in manner and form as the same in said publications are stated and set forth, wherefore the defendant, at said times in said declaration mentioned, did compose and cause to be published the said supposed libellous matters as he might justly and lawfully do, for the cause aforesaid; and this he is ready to verify; wherefore he prays judgment, if said Susanna ought to have or maintain her said action against him, &c.

*Sixth plea.*

And for further plea, by leave, &c. the defendant says, that for so much of said supposed libellous matters in said Susanna's declaration mentioned, as charges, that said Susanna made a meretricious contract with Elisha Phelps, and lived with said Elisha Phelps in an illicit and meretricious connection under such contract, the said Susanna ought not to have or maintain her said action against the defendant, because he says, that long before the committing of the said supposed grievances in this behalf, in the matter of said publications, or any of them, to wit, on the 9th day of May 1797, at Hanover, in the state of New Hampshire,—in consideration that Elisha Phelps, then, and during all his lifetime afterwards, the lawful husband of Molly Phelps, had, before that time, and while the husband of Molly Phelps, at the special instance and request of said Susanna, delivered unto the said Susanna, divers articles of female wearing apparel and ornaments, to wit, one silk dress and trimmings, of the value of nine dollars, and one set of ear knobs, of the value of seventeen cents, and a large sum of money, to wit, two dollars current coin, and had bestowed much time, care, labor, diligence and attention in and about visiting, waiting upon, watching, nursing, and physicking said Susanna, and in consideration, also, that said Elisha did then and there undertake and sincerely promise said Susanna, that he would get a bill of divorce from his wife Molly, and would give said Susanna a good education and make a lady of her, the said Susanna did undertake and promise said Elisha, that she would live, cohabit, and have sexual intercourse and carnal copulation with said Elisha; and the said Susanna afterwards, to wit, on the 9th day of June, 1797, and from that time forward, until the ——

day of April, 1819, did, in pursuance of her undertaking and promise aforesaid, live, cohabit and have sexual intercourse and copulation with said Elisha, he, the said Elisha, during all that time being the lawful husband of Molly Phelps. Wherefore the defendant at the said times, in said declaration mentioned, did compose and cause to be published the said supposed libellous matter, in the introductory part of this plea mentioned, as lawfully he might do, for the cause aforesaid. And this, the defendant is ready to verify; wherefore he prays judgment, if said Susanna ought to have or maintain her said action in this behalf against him, &c.

*Seventh plea.*

And for further plea, by leave, &c. the defendant further says, that, for so much of said supposed libellous publication in the plaintiff's declaration mentioned, as charges, that said Susanna made a meretricious contract with Elisha Phelps, and lived with said Elisha Phelps in an illicit and meretricious connection under such contract, the said Susanna ought not to have or maintain her said action against him; because he says, that long before the committing of the supposed grievances in the matter of the publications in said Susanna's declaration mentioned, or any or either of them, to wit, on the 9th day of December, 1798, at Rochester, in the county of Windsor, the said Susanna did, in the presence of one Timothy Eastman, and of sundry other respectable people, then and there assembled, publicly undertake, and promise said Elisha Phelps, then, and during all his life time afterwards, the lawful husband of one Molly Phelps, that she would live, cohabit and have sexual intercourse and carnal copulation with said Elisha ; and said Susanna afterwards, on said 9th day of December, 1798, and from that time forward until the —— day of April, 1819, did live, cohabit and have sexual intercourse and carnal copulation with said Elisha, he being during all that time the lawful husband of Molly Phelps. Wherefore the defendant, at the said times, in said declaration mentioned, did compose and cause to be published, the said supposed libellous matters in the introductory part of this plea mentioned, as he lawfully might do for the cause aforesaid. And this the defendant is ready to verify; wherefore he prays judgment, if said Susanna ought to have or maintain her said action in this behalf, against him, &c.

*Eighth plea.*

And for further plea, by leave, &c., the defendant says, that, for the following supposed libellous matters, being a parcel of the said supposed libellous matters, in the fourth and fifth counts of the said Susanna's declaration mentioned, namely ;—

" At other times, the said Susanna, admitting that there
" was a good and valid marriage between said Elisha and
" Molly, pretends, that afterwards a divorce was granted un-
" to said Molly, upon her petition, for and on account of the
" acts of adultery of said Elisha, at different times, with dif-
" ferent women, and that after such divorce granted, said
" Elisha and said Susanna intermarried, whereas the bill, by
" charge, denies that a divorce was ever petitioned for by,
" or granted to said Molly, and also charges, that if any writ-
" ten petition was made, or divorce granted, the same was
" procured by the deception, imposition, unfair means and
" practices of said Elisha and Susanna, and, as evidence
" thereof, the bill charges that, at the date of such pretend-
" ed petition, and for a long time before, said Molly was and
" had been of feeble health, severely afflicted with fits, wholly
" blind, and, therefore, unable to read and write, and incapa-
" ble of doing any business, whatever ; that said Elisha pro-
" cured the draft of said pretended petition at the instance
" of the said Susanna, and without the direction, consent, or
" knowledge of said Molly, that the said Elisha carried the
" said draft to said Molly, and while she was alone with him,
" without the advice, counsel, or support of any of her
" friends, he made many artful representations and persua-
" sions, to induce her to sign said pretended petition ; that
" the said Elisha threatened the said Molly, that unless she
" would sign such pretended petition, he would forever aban-
" don her, go without the State of Connecticut, associate
" with a harlot, and resort and dwell with said harlot in pla-
" ces remote from said Molly, and where he would indulge
" in bigamy and adultery, and all manner of unlawful lust,
" with impunity ; and that said Elisha, unmoved by
" the tears and supplications of said Molly, and led by evil
" passions, artfully excited by said Susanna, also threatened
" to sell all his property and effects, and escape with his har-
" lot beyond seas, leaving the said Molly without home

" or shelter, and doomed to wander, a blind beggar, on the " earth ; and that, further to induce said Molly to sign said " pretended petition, the said Elisha offered to convey, by " way of settlement, to her own use, the garden spot, house " and furniture, at Chatham, where the said Molly might " dwell in peace and solitude ; and so the bill charges, that " if said Molly did sign such pretended petition, she signed " the same in great anguish and distress of mind, under the " influence of the artful and fraudulent representations and " persuasions, and the threats and menaces aforesaid, with- " out free agency or consent, in the presence, by the express " requirement, and under the duress of her husband, the " said Elisha, whom she was by her duty bound to obey.

" And the bill further charges, that said Molly never gave " any order, instruction, or consent, to or for the prosecution " of such pretended petition, nor did the said Molly, in any " way or manner, countenance, approve, consent to, or know " of said pretended divorce.

" And the bill moreover charges, that the said Elisha, be- " ing moved and seduced by the wanton and lascivious blan- " dishments of said Susanna, who was then, by her craft, con- " triving to make breaches between the said Elisha and his " wife Molly, and also making shift to patch up an unseemly " and unholy alliance with the said Elisha, did, with the know- " ledge, and at the pressing instance of the said Susanna, " employ counsel to prosecute said pretended petition, in the " name of said Molly, caused depositions, proving the acts of " adultery of said Elisha with said Susanna and other wo- " men, to be taken and read in open court, before which " said pretended petition was pending, and in fraud of said " Molly, of the law, of the marriage relation, and of good " morals, procured such pretended petition to be granted un- " to said Molly."

" And, under the circumstances aforesaid, the bill charges " that the said pretended divorce, having been wrongfully " and unjustly procured, in the name of said Molly, by the " duress, menaces, covin, collusion, fraud, and circumvention, " as well of said Susanna as of said Elisha, without the con- " sent or knowledge of said Molly, and while she was blind, " sick, and disordered, and under the entire dominion and " control of her husband, the said Elisha, is, and ought to

"be holden, in law and equity, null and void, and utterly frus-
"trate, and of no effect."—The said Susanna ought not
to have or maintain her said action against the defen-
dant, because he says, that long before the committing
of the said supposed grievances in the said fourth and
fifth counts mentioned, or either of them, to wit, on the
8th day of March, 1787, one Doct. Elisha Phelps was
duly joined in marriage with one Molly Bartlett, who,
thereafter, through the providence of God, was smitten with
blindness.  And afterwards, on the 9th day of May, 1797,
at Hanover, in the State of New Hampshire, the said Susan-
na, utterly regardless of the helpless condition of said Molly,
greatly envying the enjoyments of said Molly, derived from
the love and kindness of her husband, minding and intending
to blast her conjugal happiness, to rob her of the support,
society, and comfort of her husband, and to reduce her to a
state of solitary wretchedness, and looking upon the said Eli-
sha with eyes of greedy and impure lust and wantonness,
did unlawfully and wickedly conspire, combine, confederate,
consult, consent, and agree with said Elisha, wrongfully and
unjustly to bring about and effect a divorce of said Elisha
and said Molly, his wife, to the end that said Elisha and said
Susanna might intermarry and cohabit together, as husband
and wife.  And the said Elisha, in pursuance of the conspi-
racy, combination, and confederacy aforesaid, and to carry
out and complete the same, to wit, on the 9th day of Janua-
ry, 1798, at Middletown, in the county of Middlesex, and
State of Connecticut, caused and procured to be drafted a
paper writing, addressed unto some one of the judicial courts
of the State of Connecticut, and purporting to be a petition
of Molly Phelps for a divorce from Elisha Phelps, for and on
account of his "acts of adultery at different times and pla-
ces, with different women," and with the said paper writing,
did then and there repair unto the said Molly, and while she
was alone with him in a private apartment, away from the
advice, counsel, or support of any of her friends, he set about
coercing and inducing her to sign said paper writing.  And
the said Elisha, in furtherance of the conspiracy, combina-
tion, and confederacy aforesaid, then and there threatened
the said Molly, that, unless she would sign said paper writing,
he would forever abandon her, without any the least provis-

ion for her support, and that he would fly with said Susanna beyond seas, and live with her in whoredom and prostitution ; and in further pursuance of said conspiracy, combination, confederacy, and agreement, the said Elisha offered to convey unto said Molly a piece of land in Barkhamstead, and a messuage in Chatham, together with some notes and book accounts, if said Molly would sign said paper writing ; and the said Elisha, through the influence of such fraudulent representations and persuasions, and such barbarous and inhuman threats and menaces, in pursuance of the conspiracy, combination, and confederacy aforesaid, did then and there induce and compel said Molly, in tears and much distress, being blind, and unable to read or write, in the presence and by the express requirements of said Elisha, without any free or voluntary agency, choice, or consent, on her part, to suffer her name to be set to said paper writing. And the said Elisha, in further pursuance of the conspiracy, combination, and confederacy aforesaid, did, thereafter, to wit, on the 9th day of January, 1798, at Middlesex aforesaid, on his own mere motion, and at his own proper cost and charges, without any order, instruction, or consent of said Molly, employ counsel, learned in the law, to enter said paper writing on the files of one of the judicial courts of the State of Connecticut, as and for a petition for a divorce of said Molly from said Elisha, and as such petition, to prosecute said paper writing before said court in the name of said Molly, caused depositions, proving the acts of adultery of said Elisha with said Susanna, to be taken and read in open court, before which said paper writing was depending, as and for a petition for divorce, and in fraud of said Molly, of the law, of the marriage relation, and of good morals, procured a judicial decree to be made by said court, purporting to divorce said Molly from said Elisha—and thereby, then and there did complete, perfect, and carry out the said conspiracy, combination, confederacy, and agreement, between said Elisha and said Susanna, as aforesaid.

Wherefore, the defendant, at the said time in the 4th and 5th counts of the said Susanna's declaration mentioned, did compose, and cause to be published, the said supposed libellous matters, in the introductory part of this plea mentioned. And this the defendant is ready to verify, wherefore he prays

judgment if the said Susanna ought to have or maintain her said action in this behalf, against him, &c.

*Ninth Plea.*

And for further plea, by leave, &c. the defendant says, that, for so much of the said supposed libellous matters in the 4th and 5th counts of the said Susanna's declaration mentioned, as charges that the said Susanna was accessary to a compulsory, covinous, collusive, fraudulent, and deceitful divorce of Molly Phelps from Elisha Phelps, the said Susanna ought not to have or maintain her said action against the defendant, because he says, that before the committing of the said supposed grievances in said 4th and 5th counts mentioned, or either of them, to wit, on the 9th day of May, 1797, at Hanover, in the State of New Hampshire, the said Susanna did unlawfully conspire, combine, confederate, consult, consent, and agree with Elisha Phelps, then being the lawful husband of Molly Phelps, to bring about and effect, wrongfully and unjustly, a divorce of Elisha Phelps and Molly his wife, to the end that said Susanna might intermarry with, and take for husband the said Elisha.——Wherefore the defendant, at the said time in the said 4th and 5th counts of the said Susanna's declaration mentioned, did compose, and cause to be published, the said supposed libellous matters in the introductory part of this plea mentioned, as well he might, for the cause aforesaid. And this the defendant is ready to verify, wherefore he prays judgment if said Susanna ought to have or maintain her said action in this behalf, against him, &c.

*Tenth plea.*

And for further plea, by leave, &c., the defendant says, that for so much of said supposed libellous matters in the said Susanna's declaration mentioned, as charges, that said Susanna made a meretricious contract with Elisha Phelps, and lived with said Elisha in a meretricious and illicit connection under such contract, the said Susanna ought not to have or maintain her said action against the defendant, because he says, that long before the committing of the said supposed grievances of the defendant, in said Susanna's declaration mentioned, or any of them, to wit, on the 9th day of June, 1797, at Rochester in the county of Windsor, the said Susanna did intermary with, and take for her hus-

WINDSOR,
February,
1838.

Torrey
v.
Field.

band one Elisha Phelps, who then was, and for a long time before had been, the lawful husband of one Molly Phelps, then, and still in full life; and the said Susanna from that time forward, for and during a term of twenty one years, under color and guise of such intermarriage, did live, cohabit, have sexual intercourse and carnal copulation with said Elisha, he being, through all the time aforesaid the lawful husband of said Molly Phelps. Wherefore the defendant, at the said times in said declaration mentioned, did compose, and cause to be published, the said supposed libellous matters in the introductory part of this plea mentioned, as well he might, for the cause aforesaid. And this the defendant is ready to verify; wherefore he prays judgment, if the said Susanna ought to have or maintain her said action in this behalf against him, &c.

To which pleas the plaintiff demurred, as follows, to wit.

And the said Susanna, as to all of the said several pleas in bar, by the said Roswell M. Field above pleaded, saith, that the same, and the matters therein contained, in manner and form as the same are above pleaded and set forth, are not sufficient in law, to bar or preclude the said Susanna from having or maintaining her aforesaid action thereof, against the said Roswell M. and that she, the said Susanna, is not bound by the law of the land to answer the same, and this the said Susanna is ready to verify.

Wherefore, for want of a sufficient plea in this behalf, she, the said Susanna, prays judgment and her damages, by her sustained on occasion of the committing of the said grievances, to be adjudged to her.

And the said Susanna, according to the form of the statute in such case made and provided, states and shows to the court here the following causes of demurrer, to the said several pleas in bar,—that is to say, as to the first and fourth pleas in bar, that the same profess to answer the whole declaration, and omit to answer several material parts thereof; that the same are argumentative,—that it is impossible to take any certain or precise issue thereon, and that the said first plea in bar is double, in this, that the same sets up the truth of the matters therein attempted to be justified,

WINDSOR,
February,
1838.

Torrey
v.
Field.

and the publication of the same, under the order of the court of chancery.

As to the 2d and 3d pleas in bar,—that the same amount to the general issue, and the matters, therein stated, should have been given in evidence under that issue, and cannot be pleaded specially in manner and form as above attempted to be done,—that the same controvert what the said Susanna must prove, in the first instance, in order to recover, to wit, that the publication complained of was malicious,—that they do not answer the averment in the declaration of.the motives, and set up the matters therein pleaded as a bar, whether the publications were or were not malicious, that the same do not confess the facts in either plea to be justified ;—and that the publication complained of in the said Susanna's declaration is not warranted by the course and practice of the court of chancery, and the matters, therein stated, are no justification in law.

As to the 5th plea, that the same is in general terms, and does not set forth the particulars intended to be justified or proved by way of a defence.

As to the 6th, 7th and 10th pleas in bar, that the same do not answer the charge mentioned in the introductory part thereof, that the same set up a new and different charge or libel, not complained of in the said Susanna's declaration,—and that it cannot be ascertained with any certainty, what part of the said publication the said Roswell M. intends to justify.

And as to the 8th and 9th pleas in bar;—that the several parts of said libel cannot be separated in manner and form as is attempted to be done by those pleas ; that it is not expressed, with sufficient certainty, what part of said libel is intended to be justified,—that the same do not answer what is undertaken to be answered in the introductory part thereof, and that all of said pleas in bar, are in other respects uncertain, informal and insufficient, &c. &c.

The defendant joined in demurrer.

*A. Aikens,* and *Phineas Smith,* for plaintiff.

The defendant's several pleas in bar are insufficient.

I. The 1st and 4th pleas—because,

1. They profess to answer the whole declaration, and only attempt to answer a part of it.  1 Chit. Pl. 554, 534.  1 Saund. R. 296, n. 1.  *Lewis* v. *Clement,* 5 C. L. R. 427.

*Hilsden* v. *Munn,* Cro. Jac. 677.   *Spencer* v. *Southwick,* 11 Johns. R. 573.   *Van Ness* v. *Hamilton,* 19 do. 349.

2. The general averment in the conclusion of these pleas, that all the matters contained in the publication are true, amounts to nothing.

3. The chancellor's order, alleged in the first plea, is not a justification for the defendant. The publication is not warranted by the order, or the course of practice of the court of chancery, and of this the court will take judicial notice. 1 Chit Pl. 257. *Lake* v. *King,* 1 Saund. R. 131.

II. The 2d plea is insufficient ;

1. The plea professes to answer the whole libel, and omits to notice material parts of it.

2. For a libel, it is settled law, that it is not a good plea that the libellous matter was communicated to the defendant by third persons. 1 Chit. Pl. 532. *Dole* v. *Lyon,* 10 Johns. R. 447. In the case of oral slander, the better opinion is, that such plea is not good. At all events, the plea must disclose the name of the author, &c. See cases above cited.

3. The publication, in this case, was not made in a justifiable cause, and of this the court will take notice. The chancellor's order, set up in this plea, is therefore, no justification. See authorities *ut supra.*

III. The 3d plea is insufficient ;

1. It does not answer the averment of malice in the declaration, and that question is wholly withdrawn from the consideration of the jury. *Lewis* v. *Walter,* 6 C. L. R. 537. *Mountney* v. *Walter,* 22 do. 164. 2 Chit Pl. 534. note d.

2. The court will take notice that the publication is not warranted by the order or practice in such cases. See authorities *ut supra.*

3. The publication being admitted, and the truth of the matters being not in issue, whether a libel, or not, is a question of law for the court. *King* v. *Walter,* 3 T. R. 428.

IV. The 5th plea is bad on account of its generality. 1 Chit. Pl. 533. 1 Saund. R. 244. n. 6. 1 T. R. 750. *Holmes* v. *Catesby,* 1 Taunt. 543.

V. The 6th, 7th, and 10th pleas, are insufficient ;

1. The defendant cannot divide up the libel so, and answer a part by itself,

2. The matters set up are not conformable to the libel

laid in the declaration. They introduce an entirely new and distinct charge. 1 Chit. Pl. 532. *Stow* v. *Converse*, 4 Conn. R. 33. *Hilsden* v. *Mercer*, Cro. Jac. 677. *Johns* v. *Giddings*, Cro. Eliz. 239.

3. They do not answer what they assume to answer.

VI. The 8th and 9th pleas are insufficient ;

1. They are an answer to a part, and do not sufficiently distinguish the part to be answered. 2 Chit. Pl. 504, note d. *Stiles* v. *Nokes*, 7 East, 493. *Thomas* v. *Croswell*, 7 Johns. R. 264.

2. The libel cannot be so divided, and a part justified separately from the rest. *Mountney* v. *Watton*, 22 C. L. R. 164, 166.

3. They do not answer what they assume to answer in the introductory part.

*Coolidge & Tracy*, for defendant.

The objections to the first plea all originate from a misconception of the nature and object of the plea. The plea rests for defence, simply, on the suit in chancery, and the order therein made. The prefatory statements merely serve to introduce and explain the occasion of the suit in chancery, are analagous to the preamble of the declaration, and are not tendered in issue, and not traversable. It is not material, therefore, whether they cover the whole declaration, or are argumentatively set out, as they do not constitute the ground of defence in this plea. The suit and order are directly and precisely pleaded, and on that the plaintiff should take issue.

As to what is inducement, and what is substance, see Gould's Pl. Chap. 3. § 9, p. 52 ; and § 11, p. 53. *Lake* v. *King*, 1 Saund. R. 131, where an exact precedent for this plea will be found.

To the 2d and 3d pleas, it is objected,

1. That they amount to the general issue, and the matters should have been given in evidence under that issue, and cannot be specially pleaded, as is attempted here.

No case supports this objection. It may be true that what is here pleaded might have been given in evidence, under the general issue, but all the authorities prove that the same matters may be also specially pleaded. 1 Saund. 131, n. 1. It is said " the defendant may plead these matters, for a defendant shall never be put to the general issue, where he

confesses the words, and justifies them, or, by special matter, shows that they are not actionable. See, also, 1 Chit. Pl. 488. Gould's Pl. Chap. 6, § 56, p. 334.

On principle, such matters should be pleaded specially. Speaking of the practice of giving them in evidence under the general issue, Judge Gould remarks—" Indeed, the practice appears to be, in a great measure, an arbitrary departure from the original principle of the law, and, as such, to rest on authority rather than on any known legal reason." Gould's Pl. Chap. 6, § 54, p. 333. *Carr* v. *Hinchcliff*, 10 C. L. R. 408, and cases there cited.

2. That they treat the matters as a bar, whether malicious or not.

And so do the authorities. In no case has it been decided that malice would make any proceeding, in a course of justice, a libel, nor is there to be found any instance where the plea negatives the malice. In the case of *Buckley* v. *Wood*, 4 Coke, 14, it appeared that Wood had exhibited a bill in the Star-Chamber, against Buckley, charging him with being a maintainer of pirates and murtherers, and a procurer of piracies, on which Buckley brought his action for libel. It was resolved that no action lay for matter examinable there, though it was merely false, and the reason given by the court was, not the absence of malice, but, because " 'twas in a course of justice."

In the case of proceedings in the Star-Chamber against *Prym, Bostwick, & Burton*, State trials, Vol. 1. p. 459, (2d edition,) the defendants were informed against for a libellous pamphlet against the hierarchy. The defendants filed cross-bills, treating the hierachy and archbishop Laud with great severity. " The archbishop, nettled thereat, de-" manded the opinions of the judges, whether they could not " be punished as libellers, for filing the cross-bills, who, all " but one, answered negatively, for it was tendered in a legal " way, and the king's courts were open to all men."

*Hersey's* case, 12 Coke, 103, was a complaint, charging that defendants forged a will. The court thought the complaint was brought from malice and spite, and gave damages to the defendants, *because they were without remedy for the scandal at the common law*.

In *Beauchamp* v. *Crofts*, Dyer, 385, the defendant had

brought an action against the plaintiff for forging deeds, and, pending that suit, the plaintiff brought his action for the slander therein. Defendant justified under his writ, saying nothing of malice, and, on demurrer, the court decided that the plea was good, and that the action did not lie, whether the matter were true or false.

WINDSOR.
February,
1838.

Torrey
v.
Field.

The case of *Bolton* v. *Clapham*, Sir W. Jones, 431, was thus ;—Plaintiff had made an affidavit, and the defendant had said in court, " there is not a word true in that affidavit, and I will prove it by 40 witnesses ;"—Held, that for this scandal no action could lie, because the words were spoken by way of defence, in a court of justice.

In *King* v. *Bailey*, And. 229, a paper had been addressed to certain officers, for the removal of a subordinate, suggesting fraud. It was held no libel, but a mere representation of injury for redress ; and as to the imputation of fraud the court say " it is no more than what is in every bill of chancery, which was never deemed actionable."

*Lake* v. *King*, 1 Saund. R. 130. The action was for scandal in a petition to parliament. The plea contained no denial of malice, yet no objection was taken on that account, and it was decided to be good.

In *Astley* v. *Younge*, 2 Burrow's R. 810, the defendant pleaded that the libel was published in an affidavit, by way of defence in court. The court, without hearing counsel, determined the plea good.

In *Thorn* v. *Blanchard*, in the court of errors, 5 Johns. R. 508, Clinton, senator, in giving the opinion of the court, says, " There is a certain class of cases, wherein no prosecu- " tion for libel will lie, where the matter is false and scanda- " lous ; as in a petition to parliament, articles of the peace " exhibited to a justice of the peace, a presentment of the " grand jury, or a proceeding in a regular course of justice. " The policy of the law here steps in, and controls the indi- " vidual right of redress." The same point was decided in *Harris* v. *Huntington et al.* 2 Tyler R. 129,

In none of these cases was the right held to be at all affected by the consideration of malice, but the justification was placed on the *occasion*, independently of malice or intention. In *Thorn* v. *Blanchard*, cited above, the court say, that it is immaterial whether the facts be true or false, or the inten-

tion innocent or malicious. See also Starkie on Slander, 173, 4, and 192. 1 T. R. 110. 1 Bos. & Pull. 525. 8 T. R. 293. 7 C. L. R. 220.—or whether the court has or has not jurisdiction. See authorities last cited.

3. That the publication is not warranted by the course of practice in chancery.

The true question is, whether the publication is warranted by the order; if it is, the defendant is justified, whatever may have been the practice.

The court will, *ex officio*, take judicial notice of its own course of proceedings. The bill is not set forth in these pleas, nor need it be. If the objection is, that the order has not been pursued, in respect to the publication being *more* than the substance of the bill, the plaintiff should not have demurred, but have replied, and assigned the excess. If it be objected, that the publication is *other* than the substance, then she should have traversed the allegation, that the publication is the substance, which, if found true, would be a perfect defence, as having been made in conformity to the order. By demurring, the plaintiff has confessed that the publication was the substance of the bill. To raise the question, under a proper issue, a replication of excess, by way of new assignment, was clearly necessary. 1 Saund. R. 299. n. 6. 1 H. Bl. R. 555. 2 Wils. R. 313. 3 do. 20. 1 T. R. 334. 3 do. 292. 2 Campb. R. 175. 1 Chit. Pl. 564, 603. Starkie on Slander, 349.

Should the court be of opinion that, notwithstanding the demurrer, plaintiff may go into the inquiry, as to the regularity of the publication, then it may be insisted, that the particular circumstances of fraud, in the procurement of the divorce, were not of the substance of the bill. But it was necessary to bring both the divorce and the fraud in its procurement, into the bill. As it was necessary to alledge fraud in the bill, it was also necessary to set forth in what it consisted. A general charge of fraud is insufficient, both at law and in equity. The particular circumstances must be averred, and they must be answered. 3 Atkyns, 815. 2 Vesey, 450. For the proper use of pretence and charge, see Mitford, 42.

The design of the publication is, to give notice to the defendant, that he may answer; which he cannot do, unless the charges are particular. The pretences and correlative

charges are in conformity with a precedent, *mutatis mutandis*, in Hughes' Eq. Draftsman, p. 85.

To the fourth plea it is objected,

I. That it proposes to answer the whole declarations, and omits to answer several material parts.

To this objection the answer is, that it is not even *apparently* well taken. The literal correspondence of the facts of the plea to those of the publication, is nearly perfect, and the few variations are insignificant. Every fact and every phrase, in the publication of which it is possible to predicate any thing libellous, is met and justified precisely and fully, in terms that cannot be perverted or misunderstood.

The plaintiff has, heretofore, attempted to find in the publication three libellous charges :

1. That she lived with E. Phelps as a mistress, prior to the divorce ;

2. Instigated him to obtain a fraudulent divorce ;

3. Lived with him in adultery during twenty years.

The first charge is endeavored to be supported by reference to Hopy Talbot. She is stated to have been a housekeeper and hand-maiden in the mansion house of said Elisha, and only by the most imaginative inference or intendment, can this be tortured to mean that she was a mistress. The use of the reference to Hopy's serving without pecuniary compensation appears in the after part of the bill, it being designed to limit the plaintiff's claim to compensation. But, granting that the same, taken in connection with other parts of the publication, is defamatory, the plea justifies it by averring a *meretricious copulation* as, early as August, 1797, nearly a year before the divorce.

The second charge is justified, beyond all cavil.

The third charge is not in the publication. If the comparison of plaintiff with Hopy Talbot be the ground of the supposed charge, that has been already answered. If it be founded on the statement, that the plaintiff's connexion with said Elisha was "meretricious and unlawful," the answer is, that these terms do not imply the crime of adultery. *Meretricious,* is a technical term, applied to any other than a *lawful* marriage. It is used in this sense by Blackstone, Com. B. 1 Cap. 15 where, speaking of certain disabilities to marry, he says—"If any persons under these legal incapacities

come together, it is a meretricious and not a matrimonial union. In *Fenton* v. *Reed*, 4 Johns. 52, it is used in the same sense.

But, admitting, by supposition, that the publication, although avoiding to so charge in terms, does nevertheless, equivalently, imply that the plaintiff's connexion with said Elsha was adulterous, does not the plea justify the charge by alleging facts, which, if found, would constitute the evidence. For this, as well as every other purpose in justifying, the plea must be taken entire. It will not, we apprehend, be denied, if the plaintiff "well knowing that said Elisha was the law-" ful husband of said Molly," did "by many wanton &c.and by " wicked wiles tempt &c. and instigate said Elisha, to live and " cohabit with her, the plaintiff, and to procure a false, fraudu-" lent &c, bill of divorce &c., *to the end* that said Elisha and " Susanna might have &c., and the said Elisha, seduced by " the instigation of said Susanna, and *in pursuance thereof*," did obtain such a divorce, and thereupon the plaintiff and said Elisha did, with or without the forms of marriage, carnally know each other, and if, too, the plaintiff, "from the 9th " day of June, 1797, (which was nearly a year before the di-" vorce) for and during a period of twenty years," cohabited with said Elisha, and during all that time did have unlawful, meretricious &c.intercourse and copulation with said Elisha,-- all which is positively averred in the plea—that the plaintiff's connection with said Elisha was that of adultery, if the law so declared it, otherwise not ; and the defendant cannot be held by construction or inference, to have charged the plaintiff with a greater offence than the law would pronounce upon her acts.

The test of the plea is this—were the facts of the plea proved, on issue joined, would they not conclusively establish the truth of every defamatory imputation, whether directly stated upon, or reasonably to be inferred from, the supposed libel ?

If the matters of fact be justified the epithets fall to the ground. *Astley* v. *Younge*, 2 Burrow. 810. Starkie on Slander, 339.

It is enough, if the substance of the libellous statement be justified. "As much must be justified as meets the sting of the charge. *Edwards* v. *Bell*, 1 Bing. R. 403.

The other objections to this plea do not exist.

To the 6th 7th and 10th pleas, it is objected,

1. That the same do not answer what they profess to answer in the introductory part thereof.

2. That they set up a new and different charge or libel not complained of.

3. They do not show with certainty what parts of the declaration the defendant intends to justify.

The third objection does not attach to either of these pleas. A plea of justification is good when it refers to a certain part of the libel, if the court can see with certainty what part is referred to. The matter justified here is perfectly obvious. 7 East. R. 493. Starkie on Slander, 345. 2 B. & A. 685. 29 Com. L. R. *Clark* v. *Taylor*. 435.

The first objection, it is evident, is ill founded, as to the sixth plea. This plea goes back to May, 1797, fifteen months before the divorce, succinctly sets forth all the facts of that part of the libel which is supposed to charge a meretricious contract, and is unquestionably a good answer *pro tanto*.

As to the seventh plea, which goes no further back than December, 1798, a period subsequent to the divorce, the plea may or may not be considered good, as the construction of the libel shall be taken one way or the other. If, as is insisted by defendant, the supposed libel does not, *ex vi termini*, or otherwise, charge the plaintiff with the meretricious agreement prior to the date given in the plea, then the plea is good. If the libel does so charge, then the plea, not covering that time, may be deemed defective.

The opinion of the court was delivered by

REDFIELD, J.—In this case, no question is made in regard to the sufficiency of the declaration. It seems to be admitted by the counsel for the defendant, that the matter, set forth in the declaration, as having been published by defendant, is in itself sufficiently libellous.

The defendant relies upon his pleas in bar, as being sufficient to justify the publication. These are ten in number. The county court rendered judgment for the defendant. If any one of his pleas is good, that judgment must be affirmed.

The pleas, after the fourth, are all manifestly bad. The fifth plea is but a general plea of the truth of the matters

set forth in plaintiff's declaration, without specifying any particular facts. This mode of pleading the truth is never allowed. The particular acts done by the plaintiff, which the defendant relies upon, as constituting the charge, must be spread upon the record and presented to the court, that they may judge, whether the facts warrant the charge made in the libel. *Holmes* v. *Catesby*, 1 Taunton, 543. *J'Anson* v. *Stuart*, 1 Term R. 748. *Carr* v. *Jones*, 1 Smith, 491. In the latter case it was held well enough to refer to the declaration, and to that *part* of the libel attempted to be justified, generally—by saying " from such a word to such a word,"—as is done in many of the pleas in this case.

In the sixth plea, the defendant attempts to justify that part of the libel denominated the " Hopy Talbot contract," by pleading the truth. The libel complained of, in this portion, charges that the plaintiff was the kept mistress of Doct. Phelps, on the same terms upon which said Hopy had been kept, *i. e.* being furnished with food and drink and clothing, and lodging, *i. e. support.* The plea alleges a contract of prostitution, in consideration of various articles of female wearing apparel, dress, ear-rings and money. This is a contract of the *same character*, but not in the same terms. The *degree* of *turpitude* is the same, but the *transaction* is not the same. Proof of the plea will not show the alleged libel true.

The authorities all concur in this, that where the defendant will justify by showing the truth of the matters charged in the libel, it must be the truth of the " very charge," and it is not sufficient to plead and prove the plaintiff guilty of a *similar* offence, or even of one more flagrant.

In *Johns* v. *Giddings*, Cro. Eliz.—the charge was that plaintiff was a thief, and the plea that defendant furnished plaintiff with cloth, who made *his garments too strait*, and therefore he published the words. The plea was held bad, as not amounting to a charge of theft. It is bad for that reason, and also for counting upon the evidence and not its legal effect.

In *Hilsden* v. *Mercer*, Cro. Jac. 677, the charge was that plaintiff was a thief, and stole twenty pounds from me, and forty pounds from you. Plea that " he stole two hens,"

bad.  The same doctrine is holden in *Stow* v. *Converse*, 4 Conn. 18.  *Treat* v. *Browning*, do. 408. Buller's, N, P. 9.  *Smithies* v. *Harrison*, 1 Ld. Raymond, 727.  *Andrews* v. *Vanduzer*, 11 Johns. 38.

The reason of the rule, requiring such strictness in pleading the truth, is, that such justification does not always rebut all presumption of malice.  A man may publish the truth, from motives of the most deep seated and rancorous malice, and still not be liable to an action, for the reason that the plaintiff has no ground of complaint.  The truth is what any man has good right to assert, at all times.  But it is not always prudent, and a man may sometimes do it, very much to his own prejudice.  But the truth is never slander.  The person assailed, however, under this shield, has the right to insist, that, for one offence, he shall not be held guilty of the whole law.  He may insist that the defendant shall justify the "*very words*" spoken.

The seventh plea is liable to similar objections.  It attempts to justify the same portion of the libel, by alleging a contract at Rochester, before Timothy Eastman, to have sexual intercourse with Doct. Phelps, without any consideration.  In a moral point of view, or as a question of public policy, it may not be very material, whether the contract of concubinage be without consideration or not.  Whether it be fashionable profligacy, lust, or the prostitution, which is said to exist in our cities, for the mere purpose of daily subsistence, is not very important.  But all will agree that these conditions or relations are not the same.  And he who would justify malice, by proving the truth of his words, must see to it that he proves "the truth."

The eighth plea attempts to justify a portion or "parcel" of the libel *in hœc verba*, purporting to be recited continuously.  In this extract are some important omissions.  That portion, in which it is said that plaintiff "was living with Doct. Phelps, as the successor of Hopy Talbot, &c. is wholly omitted.  This is material, as being in itself libellous, and also with reference to the *identity* of the "parcel" of the libel, attempted to be justified.  What is said of Doct. P. having taken professional counsel, &c. is also omitted.  This latter does not seem to be material, except as to the identity of the "parcel."

In attempting to recite a writing *in hæc verba*, the pleader must be holden to great strictness. If there is but the omission, or substitution, or addition of a single word, there is a variance. The writings recited are not the same. It cannot be said that any part of the libel, in this case, corresponds, even in substance, with that attempted to be justified. A plea to part of the declaration is well enough. But the part, pleaded to, must be definitely pointed out, which is not done here.

This plea is further defective, in not covering all the ground assumed in the premises. The plea, after reciting the parts pleaded to, wholly omits to offer any justification for material parts of the libel extracted, viz. "That the said Elisha had been induced to employ counsel at the pressing instance of the plaintiff, and that she was making shift to patch up an unseemly and unholy alliance, &c." These matters are material, and found in the part of the libel pleaded to, and not answered. The plea is therefore bad. It should contain a sufficient answer to all which it attempts to answer. The authorities are very full to this point, *Vanness* v. *Hamilton*, 19 Johns. R. 369. *Clark* v. *Taylor*, 29 C. L. Rep. was the case of a motion to enter judgment summarily upon that part of the declaration not justified, and the court held that part not libellous. It does not, therefore, contravene the doctrine held here, but, on the contrary, confirms it.

The ninth plea attempts to justify all that part of the declaration, which charges that the plaintiff was accessary to Doct. Phelps' procuring a fraudulent divorce from his first wife, by alleging the truth of those matters. But the plea omits all mention of the means used, or, indeed, that a divorce was in fact obtained, which would seem to be of the very substance of the charge. The libel complained of most undoubtedly implicates the plaintiff in all the base and scandalous means resorted to, for procuring the divorce. She is there represented as being accessary to those means and subterfuges. But the plea simply alleges the making of a corrupt agreement between the plaintiff and Doct. Phelps, for the purpose of procuring a collusive decree of divorce between him and his wife, with a view to a marriage of the parties, and does not allege any act done in furtherance of such agreement. It is very questionable, whether just such a charge as that contained in the plea amounts to a libel. Such a

charge, not in writing, most clearly would not amount to verbal slander, as not charging any indictable offence. There must be some act done in furtherance of the corrupt agreement, before the parties are liable to indictment. But whether a libel or not, it is not the same charge contained in the supposed libel. The plea is, therefore, bad.

The tenth plea attempts to justify that part of the supposed libel, in which the plaintiff is charged with becoming the successor of " Hopy Talbot," by alleging a marriage of the plaintiff with Doct. Phelps, while he was the husband of another. This plea is liable to the same objection with the sixth and some others. If the plaintiff entered into such a contract, knowing the disability of Doct. Phelps, she would not be less criminal on account of the form of a marriage ceremony. But if ignorant of such disability, as, for any thing in *this* plea alleged, she might be, the contract and marriage, on her part, would be unworthy of blame.

The fourth plea attempts to justify the entire publication, by alleging the truth of the matters therein contained. The pretences are not attempted to be justified. These are as libellous as any part of the publication, and as much required to be met by a plea, attempting to answer the whole declaration. It is true, many of the pretences are nonsensical and unmeaning, but all seem to have been studiously sought out and introduced for the purpose of exhibiting the conduct of the plaintiff, either in a wicked or ridiculous light, and some times in both relations. When it is represented that plaintiff pretended to have had actual cohabitation with Doct. Phelps, while he was the husband of Molly Phelps, it amounts to nothing less, than accusing plaintiff of publishing her own infamy and criminality.

The remaining pleas are all of one character. The first plea alleges that the facts contained in the stating part of the bill were true, and that the defendant, having married the said Mary Almira, and having an interest in the subject matter, filed his bill, procured a chancellor's order, and made the publication, in accordance with the rules and practice of the court of chancery, it being the substance of the bill. The plaintiff contends this plea is bad for duplicity, in relying upon the *truth* of the matters contained in the bill, and also that the publication was made in the course of judicial proceed-

ings. But it is evident, that what is said of the truth of the facts stated in the bill, is merely inducement to the gist of the plea, which is the publication under a chancellor's order, in the course of judicial proceedings. In this view there is no duplicity. Duplicity in pleading is when the plea or replication, &c. contains two distinct matters, either of which is claimed by the pleader, or is in fact, a sufficient answer to the foregoing matter of the opposite party, and requires two or more distinct answers, which may present more than one issue, to be tried, perhaps, by different tribunals. If the facts alleged are ever so multifarious, yet, if they all go to make up one entire result, and do not require but one answer, there is no duplicity. There is no more duplicity in this plea, than in the second, which alleges that, having heard these matters from common report, and believing them, and having intermarried, &c. he brought his bill, obtained a chancellor's order, and made the publication complained of as a libel, in the due course of judicial proceedings.

The second plea is objected to for another reason, i. e. that it attempts to justify the publication of the matters complained of, on the ground of common report. But this objection is not well founded. The defendant does not, in this plea, allege the common report as the foundation of the right to publish, but simply as the reason why he instituted judicial proceedings.

Common report, as a justification of publishing slanderous matter, whether in writing or not, has never been considered sufficient. It is received in mitigation of damages, as tending to show that plaintiff has lost less than if such reports had not been previously in circulation. But in order to amount to a justification it must appear, in actions for verbal slander, that, at the time of speaking the words, the defendant gave the *name* of the informant. And in an action for libel, it must appear that defendant set forth, in the publication, the name of the author, and the "very words" of the author. *Maitland* v. *Goldney*, 2 East, 426. This is required, say the books, in order to give the person assailed a perfect cause of action, against the originator of the charge. With deference to the authorities, I have always thought a better reason might be found in the fact, that in publishing the very words of another, *as his*

**413**

*words,* you do not add currency to the accusation, by putting into the scale the weight of your own character, which may be good, whereas that of the author may have been wholly worthless.   If, at the time of speaking the words, you give them as the words of another, it goes very far to rebut all presumption of malice in you.   It may be doubted, whether, on principle, a libel ought ever to be justified, by giving up, at the time of the publication, the name of the author, if the author did not put the charge in writing.   By reducing oral slander to writing, its character is very materially changed, and its importance very much enhanced.   Hence the excuse would seem to fall short of a full justification.   But the cases treat the justification as sufficient, even in cases of libel.

But this plea does not seem to rely upon this as a ground of right to publish the paper complained of.   It is introduced merely as inducement to the plea, which is much the same, in other respects, as the first plea.

Upon principle, we think this plea puts the defence upon the true ground ;—That being interested in the subject matter, and having learned, from common report, such facts as induced him to believe he might recover, he, in good faith, instituted the suit, which was the occasion of publishing the paper complained of.

While, on the one hand, the party ought not to be required, in the course of judicial proceedings, to see to it, that every allegation, which he might deem for his interest to put upon the record, or which, in the ordinary course of such proceedings it might seem necessary to publish, should, in the event of the suit, prove religiously true, it is evident, on the other hand, that no more ought he to be permitted, under the guise and form of judicial proceedings, to publish scandal, and the basest slander, without having any interest or occasion to make such publication, except the gratification of personal malice.   No person ought, in the course of judicial proceedings, even to publish that which he has no reason to believe, and does not in fact believe, and has no occasion to publish, except for some secondary purposes.   But it must be confessed, the authorities upon this subject do not fully warrant this conclusion.   The precedents and the decided cases do not require any inducement to the plea of justifica-

tion under judicial process. If published " in the due course of judicial administration," it is sufficient.

The third plea is drawn strictly in accordance with the rules just stated, without any inducement. So that the three pleas, now under consideration, are, in substance, strictly of the same character, alleging that the publication was in the due course of proceedings in the court of chancery. And it does seem to be an admitted principle of the law of libel and slander, that no action lies for any thing said, or written, or published, in the ordinary course of judicial proceedings, and which comes within the ordinary scope of the forms and process therein, however groundless or malicious the suit may be, even if the process of the court is sought, as the mere cloak of malice and slander. *Lake* v. *King*, 1 Saund. R. 120, and notes, and authorities there cited.

This defence is always available, under the general issue even, but may be pleaded specially, as may any other matter, which admits the speaking of the words, or the publication of the paper. If the truth of the words is relied upon in justification, it must always be specially pleaded, but the defendant will not be compelled to plead, specially, any matter, which shows that the words were not spoken maliciously, but on a justifiable occasion, or that they were spoken by counsel, in the course of the discharge of his duty to his client, and were pertinent to the matter in question ; or in giving the character of a servant ; or where the defendant had an interest in the question, and spoke the words in the reasonable and necessary pursuit and defence of that interest. See notes to *Lake* v. *King*, 1 Saund R. 130. *McDougall* v. *Clairidge*, 1 Camp. 267. *Dresmon* v. *Briggs*, ib. 269. *Delany* v. *Jones*, 4 Esp. R. 71. But all these matters may be pleaded specially. This privilege, or immunity, for words spoken, extends equally to parliamentary proceedings, proceedings in the state legislatures, and in congress ; to parties, witnesses, jurors, judges and counsel, in courts of justice ; in short, to any one, who, in the course of the discharge of public duty, or in pursuit of private rights, is compelled to participate in the administration of justice, or in legislation. The rule is made thus broad, in relation to public functionaries, that they may feel under no constraint, or embarrassment, inconsistent with the faithful and fearless discharge of their

Windsor,
February,
1838.

difficult and important duties. Perhaps the reason and the necessity of the rule, in relation to public officers, is sufficiently obvious ; *i. e.* to secure independence and impartiality.

But the *rationale* of the rule, as applicable to private suitors, is not as readily perceived. It is said to have been adopted, so that the poor, the humble, the unprotected and defenceless, might come fearlessly into the courts of justice, without being intimidated by the possible chance of being sued for libel or slander, by one of such wealth, power, or influence, as to make the contest too unequal to be hazarded.

We could well suppose a condition of society of such unequal relations of ranks and castes, as to require some such immunity to protect the humble against the mighty. But I must conclude that the rule, in its broadest extension, is more applicable elsewhere than here. The rule is, indeed, not a little creditable to the character of the courts of that country, from which we derive most of our precedents in jurisprudence, but it does seem to argue a state of society, never to be too much deprecated. There is, in principle, no good reason why a suitor in court should be permitted to publish slander with impunity, more than any other one, except so far as he may honestly believe, on advice, is necessary for the redress of his wrongs, and the obtaining of his just rights. But, as has been said, the rule is much broader than this. And although the party may be liable to an action for malicious prosecution, for instituting a groundless suit maliciously, and damages may be increased by the scandal brought on the plaintiff, yet, however slanderous or malicious the suit may be, if founded on probable cause, although instituted for the leading purpose of scandalizing the plaintiff, yet if the defendant keep himself within the ordinary forms of process and pleading, he is, in no sense or manner, liable for the scandal thus wantonly brought upon the plaintiff. If the matter were *res integra*, we might be inclined to qualify this rule. But such is now the settled law. And it is a principle of long standing, and has not, in practice, been found the occasion of any great injury or wrong. It being our duty to declare the law, as it existed in England at the time of our statute adopting it, we do not consider this portion of it as so far inconsistent with our circumstances or condition, as to warrant us in disregarding it. The rule, as it exists in England,

has been adopted in many of the American States, and we are not informed that, practically, any bad results have followed. But we should require that the party, claiming the protection of this rule, should keep strictly within its limits. If he publishes more than is warranted by the ordinary forms of process and pleading, or on an occasion not requiring it, he cannot claim the protection of a suitor in court.

To apply this to the present case, it may well be said that it is the common and ordinary form of proceeding in courts of chancery, to file a bill similar, in its formal parts, to the present. The pretences are not indispensable, but they are usual. After the filing of the bill, it is every day's practice to publish the substance of it, under a chancellor's order. Whether the party, in this case, published more than was necessary, or more than he was warranted in publishing, is not a question properly arising upon the demurrer. If the defendant did publish more than he was warranted in doing by the order, he is liable for the excess, if that contained scandal of a libellous character, and was published with a malicious intent to defame the plaintiff, and expose her to public disgrace, ridicule, and contempt. But the excess should have been specially replied by the plaintiff, and would then stand as the basis of her claim for damages, and the question of defendant's intent, in the publication of the excess, must be referred to the jury. For it is not to be tolerated, if the party shall, in good faith, publish more than is strictly warranted by the chancellor's order, that he should be liable to an action on that account. But if he publish more, and the excess is libellous, he is, *prima facie*, liable, and it is incumbent on him to show that he was not actuated by any malicious intention, in that portion of the publication. And the jury are not to infer that he was not actuated by malice, unless upon proof of some other sufficient motive.

Upon the demurrer to the pleas, as in the present case, the county court could not take notice whether the publication was according to the course of chancery practice or not. A majority of that court are not supposed to be acquainted with the rules of practice in the court of chancery and are not bound to be ;— for rules of court are no part of the fixed law of the land. They are liable to change from term to term, by

order of the court, and in fact do change without its being supposed that any fixed principle is thereby unsettled.

Whether any given matter is, or is not according to the rules of practice in the court of chancery, is as much a question of fact, as the orders, sentences and decrees of that court. It is susceptible of definite proof. The defendant pleaded that his publication was according to the practice of that court, and the plaintiff demurred. The county court were fully warranted in adjudging the pleas sufficient. The excess should have been replied by way of new assignment. This course of pleading is in analogy to other cases decided in relation to slander and libel.

To a plea of justification of libel on the ground of the matters being true, the general replication *de injuria* is, in most cases, sufficient. But there are some exceptions. The replication is required to be special, when the plaintiff relies upon a pardon obtained before the publication of the libel. If the defendant justify the libel, as the words of another, and so represented at the time of publication, and the name of the author be given in the paper, and the plaintiff rely upon showing that the defendant, at the time of the publication, knew the charge to be false and that the author had recanted it, he must reply such matter specially. Moore, 863, 872. *Maitland* v. *Goldney*, 2 East. 426. There is the same reason for a special replication in the present case, by way of new assignment. The three first pleas are sufficient, and the judgment of the county court must be affirmed.

On motion of the plaintiff, and on terms, the court reversed the judgment of the court below, and gave the plaintiff leave to withdraw the demurrer and file a replication to the defendant's pleas, which had been adjudged sufficient.